**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| RENISHAW PLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-CV-3485 |
| v. | ) | |
| | ) | Hon. Rebecca R. Pallmeyer |
| TESA SA, and | ) | Presiding Judge |
| HEXAGON METROLOGY, INC. (also dba | ) | |
| TESA USA, BROWN & SHARPE, INC. and | ) | Hon. Judge Nan R. Nolan |
| SHEFFIELD MEASUREMENT, INC.) | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO DISQUALIFY OLIFF &
BERRIDGE FROM ITS REPRESENTATION OF RENISHAW PLC**

Defendants TESA SA and Hexagon Metrology, Inc. respectfully submit this Memorandum in Support of Their Motion to Disqualify Oliff & Berridge from Its Representation of Renishaw plc ("Renishaw").

**I.    PRELIMINARY STATEMENT**

"Loyalty to a client ***prohibits*** undertaking representation directly adverse to that client without the client's consent." *Andrew Corp. v. Beverly Mfg. Co.*, 415 F. Supp. 2d 919, 924 (N.D. Ill. 2006) (quoting N.D. Ill. L.R. 83.51.7 Comm. Cmts.) (emphasis added). A lawyer's duty of undivided loyalty extends to the client's corporate affiliates if they share a unity of interest. The defendants here are part of such an integrated enterprise known as the Hexagon Metrology Group ("Hexagon Metrology" or "Group"), composed of a number of wholly owned subsidiaries involved with precision measuring technology. (Cmplt. ¶¶ 4, 5.) For conflicts

purposes, the Hexagon Group companies operate as an integrated whole, with commonly controlled business, financial, research and development, and legal strategies.

Oliff & Berridge ("Oliff & Berridge" or "Oliff") has breached its duty of loyalty by simultaneously representing both Renishaw and at least two companies of the Hexagon Group. For example, Oliff & Berridge today serves as patent counsel to the one of the Hexagon Group's wholly owned subsidiaries, for which it is prosecuting at least ten patent applications with the U.S. Patent and Trademark Office ("PTO"). As late as **June 23, 2008**, Oliff billed the Hexagon Group's outside chief European patent attorney, Dr. Bernd-Günther Harmann, for this representation, including preparing and reviewing confidential correspondence with him. Yet, less than a month later, Oliff identified Dr. Harmann as an adverse witness in Renishaw's discovery responses. Thus, the Hexagon Group now faces the very real prospect that Oliff will cross examine Dr. Harmann with whom it has repeatedly discussed Hexagon's confidential patent strategies.

Oliff & Berridge cannot deny its simultaneous representations, many of which are detailed on the PTO web site. Instead, it is forced to argue that no conflict exists because those clients are not "affiliated" with the named Hexagon entities in this case.

But Renishaw's own admissions—in pleadings signed by Oliff & Berridge—prove otherwise. Renishaw's Motion for Preliminary Injunction heavily relies upon the Hexagon Group's common control over its wholly owned subsidiaries to argue irreparable harm: "Making this situation more critical for Renishaw is **Hexagon's ownership and control** of several of these Renishaw customer companies, including Brown & Sharpe and Sheffield." (Dkt. 12 at 12 (emphasis added).) No debate exists that "Hexagon" here refers to the parent Hexagon Group, not just the named Defendants. In his declaration supporting the preliminary injunction motion,

Renishaw's President flatly states that "Hexagon" means "Hexagon AB and its Hexagon Metrology [G]roup, including Hexagon Metrology, Inc." (Somerville Decl., Dkt. 12, ¶ 35 & n.2.) As if this were not enough, Renishaw's Complaint likewise admits that Hexagon Metrology, Inc. and TESA SA "operate as part of the Hexagon Metrology Group of Hexagon AB." (Cmplt. ¶¶ 4, 5.)

Oliff & Berridge simply cannot have it both ways. While moving for a preliminary injunction, Oliff cannot admit that the Hexagon Group subsidiaries are part of unified, commonly controlled enterprise, but, in fending off disqualification, argue those same subsidiaries are unrelated, autonomous businesses. Indeed, these irreconcilable arguments raise issues regarding Oliff's duty of loyalty to Renishaw as well—to justify its dual representations, Oliff must repudiate a key part of Renishaw's irreparable harm theory. This is precisely why the Northern District of Illinois Rules of Professional Conduct prohibit simultaneous representations of adverse clients and why Oliff & Berridge should be disqualified.

## II.    STATEMENT OF FACTS

### A.    The Hexagon Group

#### 1.    The Hexagon Group Is a Commonly-Controlled Entity

Hexagon AB, operating under the designation of Hexagon Metrology Group, is a global provider of advanced measurement systems.[1] Composed of a number of fully integrated entities, including its wholly owned subsidiaries Hexagon Metrology, Inc.,[2] TESA SA, Leica Geosystems AG ("Leica Geosystems"), and C.E. Johansson, the Group's international presence has helped

---

[1] For an organizational chart of the Hexagon Group, see the Declaration of Bo Pettersson, attached as Ex. 1. For a summary of the Hexagon Group, see the *Hexagon Metrology Company Profile* from the Group's website, attached as Ex. 2.

[2] Hexagon Metrology, Inc. includes Hexagon's products sold under TESA, Brown & Sharpe, and Sheffield Measurement brands.

transform it into a leader in the measurement technology industry.  Since 2000, the Hexagon Group has substantially expanded its global operations though both internal growth and acquisitions.[3]

Led by its President and CEO, Ola Rollén, the Hexagon Group's managerial team directs the Group's overall operations, including its business, financial, research and development, and legal strategies.  (Pettersson Decl. ¶ 4.)[4]  For example, the responsibilities of the Hexagon Group's Board of Directors ("Board") include "determining the overall objectives for the company's operations, developing and monitoring the company's overall strategy, decisions concerning major company acquisitions, divestments and investments, and ongoing monitoring of operations during the year." (Pettersson Decl., Tab A at 43.)  In addition, Hexagon's "Group Management," composed of Mr. Rollén, Håkan Halén, the CFO, and Gert Viebke, the Vice President of Strategy, "is responsible for overall business development, and apportioning financial resources between the business areas, as well as matters involving financial and capital structure."  (*Id.* at 44-45.)

Group Management regularly meets with the other members of the Group's operations team, including William Gruber, President and CEO of Hexagon Group's North American operations, to ensure the implementation of "Group Management's overall controls down to a particular business operation and geographical region . . . down to individual company level." (*Id.* at 45.)  Under this system, Mr. Gruber oversees the North American operations, including Hexagon Metrology, Inc., C.E. Johansson, and Leica Geosystems.  (Pettersson Decl. ¶ 12.)

---

[3] For example, the Group acquired Brown & Sharpe, Inc. in 2001; C.E. Johansson in 2002; and Leica Geosystems in 2005.

[4] A complete copy of Hexagon's 2007 Annual Report is available at http://investors.hexagon.se/index.php?p=reports&afw_lang=en

The Group also has integrated its financial management.  The Board annually determines the Group's financial policy, which "indicates the guidelines for financial exposure and how these should be managed in the Group."  (Pettersson Decl., Tab A at 39.)  The CFO, Håkan Halén, oversees the merger of all financial statements for the various Hexagon Group entities into a consolidated Group-wide financial statement; Mr. Halén disseminates only this master consolidated statement to the public.  (Pettersson Decl. ¶ 5.)  Finally, the Hexagon Group's integrated treasury system includes an internal bank to "coordinate currency and interest rate exposure" and "the Group's external borrowing and its internal financing."  (Pettersson Decl., Tab A at 39.)[5]

The Group's Chief Technology Officer, Bo Pettersson, manages the Group's integrated research and development efforts, including its central research unit in Heerbrugg, Switzerland. (*Id.* ¶ 7.)  Responsible for directing the engineering, research, and development of both existing and new products for all Hexagon companies, Mr. Pettersson regularly collaborates with team members from various Hexagon entities at all stages of the development process.  (*Id.*)

Moreover, the Hexagon Group's in-house legal department, composed of attorneys Frederick London and Collin Webb, centrally manages the Group companies' legal affairs.  (*Id.* ¶ 8.)  Mr. London, the Group's General Counsel, supervises the Group's world-wide legal matters, while Mr. Webb, the Group's Assistant General Counsel for North America, focuses on the Group's North American legal interests.  (*Id.*)  Both are actively involved in this current litigation.

---

[5] As the Group's entities generate revenue, the treasury system systematically sweeps these funds into a central group account over which Group Management has control.  (Pettersson Decl. ¶ 5.)

The Hexagon Group's legal and R&D departments jointly manage its intellectual property matters. For example, in addition to his general legal responsibilities, Mr. Webb manages the Hexagon Group's North America intellectual property, including the patent prosecution of the Group's North America based inventions, and also provides counsel on selected world-wide intellectual property matters. (*Id.* 9.) Under the direction of Mr. Pettersson, the Group's Director of Intellectual Property, Dr. Klaus Schneider, handles patent prosecution for European-originated inventions and oversees the overall Group patent portfolio. (*Id.*) To obtain non-European patents on the Group's technology, Dr. Schneider also works with the Group's European patent attorney, Dr. Bernd-Günther Harmann of the Büchel, Kaminski & Partner Est. patent firm, who instructs non-European firms, such as Oliff & Berridge, to prosecute patents on the Hexagon Group's behalf. (*Id.* ¶¶ 10, 11.)

## 2. Renishaw and Oliff Admit that the Hexagon Group Is a Commonly Controlled Entity

In its preliminary injunction papers, Renishaw heavily relies upon the Group's common "ownership and control" to bolster Renishaw's irreparable harm argument. According to Renishaw, "Hexagon's ***ownership and control*** of several . . . Renishaw customer companies, including Browne & Sharpe and Sheffield" "mak[es] this situation more critical for Renishaw." (Dkt. 12 at 12 (emphasis added).) This ownership of "major [coordinate measurement machine] manufacturers," Renishaw argues, provides Hexagon "with an inherent commercial advantage . . . . [which] would obviously not be rectified by awarding Renishaw money damages." (*Id.* at 13.)

Significantly, "Hexagon," as used throughout Renishaw's papers, refers not only to named defendants Hexagon Metrology, Inc. and TESA SA, but also the "Hexagon Metrology Group." (Cmplt. ¶¶ 4, 5.) As Renishaw, Inc.'s President, Leo Somerville, admitted in his

6

declaration, "Hexagon" is "Hexagon AB and its Hexagon Metrology [G]roup, including Hexagon Metrology, Inc." (Somerville Decl., Dkt. 12, ¶ 35 & n.2; *see also* Cmplt. ¶¶ 4, 5 (admitting that TESA SA and Hexagon Metrology, Inc. "operate as part of the Hexagon Metrology Group of Hexagon AB"); Preliminary Injunction Motion, Dkt. 12 at 1 (defining "Hexagon" as "Hexagon Metrology, Inc. . . . alone or as part of the Hexagon Metrology group of Hexagon AB").)[6]

In addition to its pleadings, Renishaw's pre-filing actions confirm the Hexagon Group's integrated control over its various operating entities. For example, Renishaw's Chief Patent Attorney, Tim Jackson, contacted Mr. Pettersson (the Group's Chief Technology Officer) and Dr. Harmann (the Group's European patent attorney) in December 2007 concerning U.S. Patent No. 5,505,005 ("'005 Patent") at issue here. (Ex.4.) Consistent with Mr. Jackson's understanding of the Group's structure, Renishaw's interrogatory answers also identify Dr. Harmann and Mr. Pettersson as "representatives and employees of Hexagon and TESA SA" with knowledge relevant to this litigation. (Renishaw's Resp. to Hexagon's Interrog. # 1, Ex. 3 at 8 .)

### B.    Oliff Has Continuously Represented the Hexagon Group

Oliff & Berridge admits that it has been and is representing commonly controlled members of the Hexagon Group, Leica Geosystems and C.E. Johansson, in patent prosecution and litigation matters. The firm is currently prosecuting at least ten Leica Geosystems patent applications before the PTO.[7] Oliff & Berridge attorney James Oliff, whose name also appears

---

[6] Renishaw also admits that C.E. Johansson is a commonly controlled Group entity. According to Renishaw, "the major CMM manufacturers with which Renishaw has long-standing relationships include, for example: a) Hexagon AB (*e.g.*, Brown & Sharpe, Sheffield Measurement, DEA, ***C.E. Johansson***, and Leitz) . . . ." (Renishaw's Resp. to Hexagon's Interrog. # 5, Ex. 3 (emphasis added).)

[7] The following Leica Geosystems patent applications identify Oliff as the counsel of record at the PTO: 11/287,390; 10/548,887; 10/527,259; 10/536,402; 10/560,432; 10/536,251;

on Renishaw's pleadings in this case, corresponded with the PTO on Leica Geosystems' behalf as recently as June 30, 2008—twelve days *after* this suit was filed.  (Ex. 6.)

This representation has involved repeated confidential communications with the Group's outside patent attorney, Dr. Harmann.  At the instruction of Dr. Schneider, who signed the Power of Attorney forms authorizing Oliff to act as Leica Geosystems' agent before the PTO, Dr. Harmann has been directing the Oliff's U.S. prosecution of these patents.  Indeed, the description of Oliff's June 23, 2008 invoice to Dr. Harmann's firm illustrates Oliff's extensive confidential correspondence with Dr. Harmann occurring *after* it filed Renishaw's Complaint.  (*See* Ex. 8.)

Oliff & Berridge's representation of the Hexagon Group also extends beyond patent prosecution.  Since 1995, the firm has represented C.E. Johansson in several patent infringement suits, including *Mitutoyo Corp. Mitutoyo Am. Corp., and C.E. Johansson* AB, Case No. 03-00990 (N.D. Ill. filed Feb. 10, 2003) ("*Mitutoyo* Litigation"), and continued this representation after Hexagon acquired C.E. Johansson in 2002.[8]   In fact, the parties only recently settled the *Mitutoyo* Litigation in April 2008.  This settlement occurred barely two months before Oliff filed the Complaint and its preliminary injunction papers.  To date, Oliff has not withdrawn from its representation of C.E. Johansson.

C. **Oliff's Representation of Renishaw Is Concurrent with Its Representation of the Hexagon Group**

---

10/545,817; 10/554,459; 10/974,781; and 10/482,279.  Attached as Exhibit 5 is a cover page of one of the patent applications, U.S. Serial No. 10/545,817, illustrating Oliff's representation. The Leica Geosystems patent applications generally relate to GPS and laser-based systems for capturing spatial measurement data, another technology in the Hexagon Group patent portfolio.

[8] Oliff & Berridge represented C.E. Johansson in these litigations: *Central Purchasing, Inc. v. Mitutoyo Corp. and C.E. Johansson*, Case No. 95-02014 (C.D. Cal. filed Mar. 29, 1995); *Mitutoyo Corp. Mitutoyo Am. Corp., and C.E. Johansson AB*, Case No. 03-00990 (N.D. Ill. filed Feb. 10, 2003); and *Central Tools, Inc. v. Mitutoyo Corp., Mitutoyo Am. Corp., and C.E. Johansson AB*, Case No. 04-00068 (D.R.I. filed Mar. 2, 2004).

While representing the Hexagon Group, Oliff also has been representing Renishaw, one of Hexagon's competitors in the coordinate measurement systems industry. Not only is Oliff the architect of Renishaw's irreparable harm theory, but it also procured the very patents Renishaw is asserting against the Hexagon Group in the preliminary injunction motion.

Oliff's recent correspondence with the PTO confirms the firm's representation of Renishaw during December 2007 through April 2008, when Renishaw was investigating Hexagon's products.[9] (*See* Somerville Decl., Dkt. 12 ¶¶ 39-41.) Although Oliff represented the Hexagon Group's Leica Geosystems and C.E. Johansson during this same time, it never informed Hexagon of this conflict or sought a waiver.

Instead, it proceeded with its adverse representation of Renishaw and, on June 18, 2008, filed Renishaw's Complaint, accusing Hexagon Metrology, Inc. and TESA SA of patent infringement. The following day, the firm filed Renishaw's Motion for Preliminary Injunction seeking to enjoin introduction of the Hexagon Group's TESASTAR-mp probe into the United States. (Dkt. 12.)

### D.    Hexagon Has Unsuccessfully Attempted to Resolve this Issue with Oliff

On July 11, 2008, the Group's General Counsel, Mr. London, contacted Oliff & Berridge attorney, James Oliff, requesting that the firm withdraw from its current representation of Renishaw in this matter. (Ex. 10.) Although Mr. London sought an explanation for this simultaneous adverse representation, Mr. Oliff's July 14, 2008 response provided none. (Ex.11.) On July 25, 2008, Mr. London repeated his request for withdrawal to no avail. (Ex. 12.) Oliff persists in denying that its representation of Renishaw creates a conflict of interest. (Ex. 13.)

---

[9] See Ex. 9 for Oliff's correspondence with the PTO illustrating its December 2007 through April 2008 representation of Renishaw.

## III.     UNDER THE UNITY OF INTEREST TEST, OLIFF REPRESENTS THE HEXAGON GROUP

Oliff & Berridge admits that it represents both Leica Geosystems and C.E. Johansson. Consequently, the only issue here is whether the nature of the Group's integrated relationship with either Leica Geosystems or C.E. Johansson requires treating the Hexagon Group as Oliff & Berridge's client for assessing conflict of interest.

### A.     For Disqualification Purposes, Hexagon Is Oliff & Berridge's Client

For the limited purpose of determining whether a law firm's representation creates a conflict of interest, courts have extended the attorney-client relationship to the client's subsidiary, parent, or sister corporations when they share a unity of interest. *See Bd. of Managers of Eleventh St. Loftominium Ass'n v. Wabash Loftominium L.L.C.*, 376 Ill. App. 3d 185 (App. Ct. 2007); *Jones v. Rabanco, Ltd.*, 2006 U.S. Dist. LEXIS 53766 (W.D. Wash. Aug. 3, 2006); *Certain Underwriters v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914 (N.D. Cal. 2003); *Ramada Franchise Sys., Inc. v. Hotel of Gainesville Assocs.*, 988 F. Supp 1460 (N.D. Ga. 1997) (sister corporations qualified as single client); *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 756 F. Supp. 789 (S.D.N.Y. 1991); and *Teradyne, Inc. v. Hewlett-Packard Co.*, 1991 U.S. Dist. LEXIS 8363 (N.D. Cal. June 6, 1991); *see also Westinghouse v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978). In performing this analysis, courts routinely consider whether the entities have a "unity of interest," focusing on common management or legal departments, business philosophies or strategies, or financial risks. *See Certain Underwriters*, 264 F. Supp. 2d at 920-25; *Colorpix Sys. of Am. v. Broan Mfg.*, 131 F. Supp. 2d 331, 337 (D. Conn. 2001) (summarizing factors courts consider in deciding whether to treat multiple corporate entities as a single client).

An assessment of these factors "must be undertaken in view of the policy concerns that underlie the particular claim of conflict." *Certain Underwriters*, 264 F. Supp. 2d at 922.  Where, as here, the conflict involves a current, as opposed to a former client, "[t]he concern . . . is not confidential information or other practical litigation advantage obtained against an affiliate, but the 'duty of undivided loyalty' owed to the affiliate." *Id.*  Thus, the Court should consider whether the Hexagon Group has a sufficient "unity of interest" such that Oliff's representation of Renishaw against the Group "reasonably diminishes the 'level of confidence and trust in counsel' held by" the Group-controlled entities the firm represents.  *Id.*

### 1.    The Hexagon Group Shares a Unity of Interest

The Hexagon Group's integrated management of its business operations, finances, research and development and legal affairs demonstrates that the Group's wholly owned subsidiaries share a unity of interest and thus constitute a single client for purposes of assessing whether a conflict exists.  In *Certain Underwriters*, for example, the court emphasized that the centralized management of operations and legal affairs between two entities was "significant":

> [F]rom the standpoint of the law's concern for client's "confidence and trust in counsel," here there is, for all practical purposes, but *one* client on both sides of [the firm's] representation.

*Id.* at 924 (citation omitted).  According to the court, this integrated management, coupled with the financial relationship between the entities, "mandate[d] the conclusion that the two should be treated as one entity for purposes of analyzing the conflict of interest."  *Id.* at 924.

Similarly, in *Teradyne, Inc. v. Hewlett-Packard Co.*, 1991 U.S. Dist. LEXIS 8363 (N.D. Cal. June 6, 1991), the court found that the parent company's "control and supervision of the legal affairs" of its subsidiary created an "identity of interest . . . sufficient for a finding that the two should be treated as a single client for the limited purpose of determining whether there is a

conflict . . . ."  *Id.* at *12; s*ee also Jones*, 2006 U.S. Dist. LEXIS 53766, at *12-13 ("overlap of staff and the intermingling of operations" warranting treating an affiliate as a current client); *Ramada Franchise Sys., Inc.*, 988 F. Supp. at 1465 (affiliates with "similar management personnel," the same headquarters, "corporate principles and business philosophy," and legal department qualified as a single client).

Based on these factors, the Hexagon Group is Oliff's current client.  As discussed above, the Board and Group Management oversee all Hexagon Group business, financial, research and development, and legal affairs.  *See supra* pp. 3-6.  For conflicts purposes, the Group, including both Leica Geosystems and C.E. Johansson, is a single, fully integrated entity.

Furthermore, Oliff & Berridge has identified Dr. Harmann as an employee of Hexagon and TESA SA with knowledge relevant to this case.  At the same time, however,  Oliff continues to have confidential communications with Dr. Harmann regarding Leica Geosystems patent prosecution strategies.  Consequently, the firm will likely cross examine its client's representative with whom it has shared these confidences.  *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 92-367 (1992) (acknowledging general prohibition against representing a client if that representation requires examination of another client as an adverse witness).  Thus, applying the rationale of *Certain Underwriters*, Oliff's representation of Renishaw "reasonably diminishes the 'level of confidence and trust in counsel' held by" Leica Geosystems and C.E. Johansson.  *Certain Underwriters*, 264 F. Supp. 2d at 922.  "[T]here is, for all practical purposes, but *one* client on both sides of [the firm's] representation." *Id.* at 924.

*Reuben H. Donnelly Corp. v. Sprint Publishing & Advertising, Inc.*, 1996 U.S. Dist. LEXIS 2363 (N.D. Ill. Feb. 28, 1996), does not require a different result.  *Donnelly* involved a "mega-firm," Jones Day, with one office representing the subsidiary while a second office

opposed the parent in litigation.[10]  *Id.* at *11.  Unlike this case, none of the Jones Day attorneys was involved in both representations.  *Id.*  Additionally, the court emphasized that the parent company's general counsel did not retain the lawyers involved in the case or "actively manage" the litigation:  "When different faces represent the corporation in each litigation, the firm is less likely to feel any divided loyalty that could affect its representation."  *Id.* at *9.

In contrast, the Group's in-house lawyers—Mr. London and Mr. Webb—actively manage all Group-related legal issues.  Additionally, three Group employees (Messrs. Webb, Pettersson, and Schneider) handle intellectual property disputes and globally manage Hexagon's intellectual property issues, including those involving Leica Geosystems.  Indeed, after Renishaw contacted Hexagon about the '005 Patent at issue, these Hexagon employees, along with Dr. Harmann, reviewed Renishaw's submissions.  (Pettersson Decl. ¶ 15.)

More significant, Oliff continues to obtain confidential information regarding the Group's patent strategies through its communications with Dr. Harmann while simultaneously identifying him as a potential witness.  Thus, unlike the dual representation in *Donnelly* which did not threaten "any divided loyalty that could affect [the firm's] representation," the breach of the duty of undivided loyalty here is palpable.

### 2.    Oliff & Berridge Cannot  Have It Both Ways

As discussed, Oliff has affirmatively admitted and relied upon the Hexagon Group's integrated managerial control and cannot now attempt to divest the company from its associated subsidiaries to avoid disqualification.   Indeed, Oliff underscores Hexagon's "ownership and control" of the Group's various companies to fuel Renishaw's irreparable harm argument:

---

[10] Oliff & Berridge, in contrast, has less than sixty attorneys, with its main office in Alexandria, Virginia.  Although the firm has a second location in St. Louis, Missouri, all attorneys identified on the firm's website list the Alexandria address for their contact information.  *See* http://www.oliff.com.

"Making this situation more critical for Renishaw is Hexagon's ***ownership and control*** of several of these Renishaw customer companies, including Brown & Sharpe and Sheffield." (Dkt. 12 at 12 (emphasis added).)  As a result of this reliance on the Group's common control, Oliff now finds itself in the predicament of arguing a position contrary to its client's best interest to avoid its own disqualification.  This tension alone places the propriety of the firm's current representation of Renishaw at issue.

In sum, the Hexagon Group's integrated control over its wholly owned subsidiaries, as supported by Oliff & Berridge's own admissions and arguments, manifests that Hexagon, TESA SA, Hexagon Metrology, Inc., Leica Geosystems, and C.E. Johansson share a unity of interest. Through its representations of Leica Geosystems and C.E. Johansson, then, Oliff was and is effectively representing the Hexagon Group.

**B.     Oliff's Unwaived Representation of Renishaw Against Its Current Client Requires Disqualification**

"Loyalty to a client prohibits undertaking representation directly adverse to that client without the client's consent."  N.D. Ill. L.R. 83.51.7 Comm. Cmts.  Adopting this established tenet of legal ethics, the Northern District of Illinois Rules of Professional Conduct expressly prevent a lawyer from "represent[ing] a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after disclosure."  N.D. Ill. L.R. 83.51.7.  These Rules bind "[a]ll attorneys and firms practicing in the Northern District [of Illinois]."  *See Safe-T-Prods., Inc. v. Learning Resources, Inc.*, 2002 U.S. Dist. LEXIS 20540, at *5 (N.D. Ill. Oct. 23, 2002) (Pallmeyer, J.).[11]  Significantly, this

---

[11] In reviewing motions to disqualify counsel, the Federal Circuit applies the law of the regional circuit.  *See Sun Studs, Inc. v. Applied Theory Assocs.*, 772 F.2d 1557, 1566 (Fed. Cir. 1985).

prohibition applies even when the dual representations are "wholly unrelated." *See Andrew Corp.*, 415 F. Supp. 2d at 924.

Oliff has violated its duty of loyalty by representing the Hexagon Group while simultaneously investigating and filing this lawsuit on Renishaw's behalf.  The firm not only continues to represent Lecia Geosystems but also represented C.E. Johansson as recently as April 2008, when Renishaw was performing its pre-filing investigation. *See Stratagem Dev. Corp. v. Heron Int'l N.V.*, 756 F. Supp. 789, 793 (S.D.N.Y. 1991) (firm's failure to "clearly terminate" its representation "by the time preparations for the instant litigation were begun" made it "*per se* ineligible" to represent the second client).

## IV.    CONCLUSION

By undertaking this simultaneous, adverse representation, Oliff & Berridge has breached its ethical duty, requiring its disqualification: "[T]he circumstances of [Oliff & Berridge's] unwaived conflict created by its concurrent representation of two clients with adverse interests eliminate[] any opportunity to fashion a less restrictive remedy [than disqualification]." *Andrew Corp.*, 415 F. Supp. 2d at 925.

Accordingly, the Defendants' respectfully request that this Court grant their motion and immediately disqualify Oliff & Berridge from its current representation of Renishaw.

Dated:  August 1, 2008                                   Respectfully submitted,

                                                         DEFENDANTS

                                                         By: */s/ Michael J. Abernathy*
                                                             One of their Attorneys

                                                         Michael J. Abernathy (mabernathy@bellboyd.com)
                                                         Alan L. Barry (abarry@bellboyd.com)
                                                         Patricia Kane Schmidt (pschmidt@bellboyd.com)
                                                         Jason A. Engel (jengel@bellboyd.com)
                                                         Marron A. Mahoney (mmahoney@bellboyd.com)

BELL, BOYD & LLOYD LLP
70 West Madison Street, Suite 3100
Chicago, Illinois  60602
(312) 372-1121
(312) 827-8000 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that true and correct copies of the foregoing DEFENDANTS'

MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISQUALIFY OLIFF &

BERRIDGE were served in the manner indicated below:

**Via ECF with courtesy copy via email:**

Patrick G. Burns
B. Joe Kim
Greer, Burns & Crain, Ltd.
300 South Wacker Drive
25th Floor
Chicago, IL 60606

**Via ECF with courtesy copy via email:**

John W. O'Meara (jomeara@oliff.com)
Aaron L. Webb (awebb@oliff.com)
Edward P Walker (ewalker@oliff.com)
John A. Radi (jradi@oliff.com)
Oliff & Berridge, PLC
277 South Washington Street
Suite 500
Alexandria, VA 22314

on this 1st day of August, 2008.

_/s/ Patricia Kane Schmidt_
One of the Attorneys for
DEFENDANTS

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RENISHAW PLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-CV-3485 |
| v. | ) | |
| | ) | Hon. Rebecca R. Pallmeyer |
| TESA SA, and | ) | Presiding Judge |
| HEXAGON METROLOGY, INC. (also dba) | | |
| TESA USA, BROWN & SHARPE, INC. and | | Hon. Nan R. Nolan |
| SHEFFIELD MEASUREMENT, INC.) | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF BO PETTERSSON IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISQUALIFY OLIFF & BERRIDGE**

NOW COMES Bo Pettersson who declares that:

1.      My name is Bo Pettersson and I am the Hexagon Metrology Group's ("Hexagon
Group" or "Group") Chief Technology Officer.  I reside in the United Kingdom and am a citizen
of Sweden.  I have been a Hexagon employee for approximately six years.  Prior to becoming
Hexagon's Chief Technology Officer, I was the Vice President - Research and Development and
Coordinate Measuring Machine Manufacturing of C.E. Johansson AB.

**A.      The Hexagon Group's Structure and Management**

2.      The Hexagon Group is an international leader in the measurement technology
industry.  The Group's organization encompasses a number of commonly controlled entities
specializing in this industry.  These entities include Hexagon Metrology, Inc.; TESA SA; C.E.
Johansson; and Leica Geosystems AG ("Leica Geosystems").  Attached at Tab A is a true and
correct copy of selected pages from Hexagon's 2007 Annual Report.

3.    The general structure of Hexagon Metrology is as follows:



4.    Ola Rollén is the Hexagon Group's President and Chief Executive Officer.  Mr. Rollén leads an integrated managerial team that directs the Group's overall operations, including its business, financial, marketing, research and development, and legal strategies.  He also is the Chief Executive Officer of Leica Geosystems.

5.    Håkan Halén is the Group's Chief Financial Officer.  Mr. Halén oversees the Group's preparation and publication of its consolidated worldwide financial statement.  In addition, the Group has an integrated treasury system that includes an internal bank to coordinate the Group's external borrowing and internal financing.  As the Group's entities generate revenue, the treasury system systematically sweeps these funds into a central group account over which Group Management has control.

6.      Gert Viebke is the Hexagon Group's Vice President of Strategy.  Along with Mr. Rollén and Mr. Halén, Mr. Viebke is responsible for strategic business development of the Group.

7.      As the Chief Technology Officer, my responsibilities include managing the engineering, research, and development of existing and new products for all Hexagon entities and brands, including Hexagon Metrology, Inc.; C.E. Johansson; and Leica Geosystems.  In this regard, I regularly collaborate with an integrated team of employees from various Hexagon entities in all stages of the product development process.  The Hexagon Group has a central research facility in Heerbrugg, Switzerland.

8.      The Hexagon Group's in-house legal department has two attorneys, Frederick London and Collin Webb.  Mr. London is Hexagon's General Counsel and oversees the Group's worldwide general legal affairs.  Mr. Webb is Hexagon's Assistant General Counsel and is an employee of Leica Geosystems.  He oversees the general legal affairs for the Hexagon Group in North America.

**B.      The Hexagon Group's Intellectual Property Portfolio**

9.      Dr. Klaus Schneider is the Group's Director of Intellectual Property and reports directly to me.  Dr. Schneider is responsible for the management and strategic guidance of the Group's patent portfolio.  Dr. Schneider's duties include retaining patent attorneys to obtain patent protection for inventions conceived by the Group's European companies.  Mr. Webb also manages the intellectual property legal issues for the Group in North America.  He is responsible for obtaining patent protection for inventions conceived by the North American companies and also provides legal advice on selected world-wide intellectual property matters.

10. Dr. Bernd-Günther Harmann, a European patent attorney of the Büchel, Kaminski & Partner, Est. patent firm in Liechtenstein, represents the Hexagon Group as its chief outside patent attorney. Dr. Harmann and his firm, among other things, obtain European patents concerning the Hexagon Group's inventions. In this capacity, Dr. Harmann works directly with Dr. Schneider. In particular, Dr. Schneider instructs Dr. Harmann concerning the worldwide patent procurement strategies for the Hexagon Group's affiliated company, Leica Geosystems.

11. At Dr. Schneider's direction, Dr. Harmann also is the liaison between Dr. Schneider and the non-European patent firms that handle the prosecution of the Group's patents in the United States. Dr. Harmann, for example, regularly works with Oliff & Berridge on Leica Geosystems's behalf to prosecute Leica Geosystems patent applications in the United States. Oliff & Berridge directs invoices to Dr. Harmann for these legal services. Dr. Schneider subsequently receives an invoice from Dr. Harmann for legal services conducted by Oliff & Berridge.

## C.    Hexagon Metrology North America

12. As shown above, William Gruber is the President and CEO of Hexagon Metrology's North American operations. Mr. Gruber is generally responsible for the day-to-day operations and implementation of the Group's strategic and business plans in North America. In addition, Mr. Gruber reports to the Group's managerial team on the performance of the North American operations to the Group's budget. Mr. Gruber also is responsible for overseeing sales, marketing and distribution of the Hexagon brands including Brown & Sharpe, Sheffield Measurement, and Leica Geosystems. Mr. Gruber also serves on the Board of Leica Geosystems USA. In addition, he is responsible for the distribution of TESA products through Hexagon Metrology, Inc.

13.     The Hexagon Metrology North America Board of Directors consists of Mr. Rollén, Mr. Halén and Mr. Gruber.

14.     I understand that in the United States, Hexagon submits integrated tax returns including companies such as Leica Geosystems and Hexagon Metrology, Inc.

**D.     Renishaw's Communications with Hexagon Group**

15.     On or about December 13, 2007, Renishaw plc's Chief Patent Attorney, Tim Jackson, contacted Dr. Harmann and me by email.  Among other things, Mr. Jackson indicated that he wanted to make Hexagon "aware" of U.S. Patent No. 5,505,005, which is at issue in the above-captioned litigation.   In response, I worked with Mr. Webb, Dr. Harmann, and Dr. Schneider to consider Renishaw's communication.

Under penalty of perjury of the laws of the United States of America, I swear that the foregoing is true and correct.

Dated: _____1/8–08_____          _____
                                            Bo Pettersson

# TAB A

Annual Report **2007**



Hexagon's mission:
To **measure** objects
To **position** objects
To **update** objects
To **time** processes



**HEXAGON**
precision in everything

anticipated to have a material impact on consolidated earnings and financial position.

To secure a return on Hexagon's investments in research and development, the Group protects its technological innovations against infringement and plagiarism. Hexagon protects its intellectual property through legal proceedings when warranted.

### Human capital risk
Since future successes are largely dependent on the capacity to retain, recruit and develop skilled staff, being an attractive employer is an important success factor for Hexagon. Group and business area management jointly handle risks associated with human capital.

### Insurable risks
To ensure well-balanced insurance cover and financial economies of scale, the Hexagon Group's insurance includes Group-wide non-life and liability insurance, travel insurance and transport insurance. In pace with the Group's development and the completion of damage-prevention programmes, the insurance programme is periodically amended so that own risk and insured risk are optimally balanced.

### Environmental risk
Hexagon does not believe that changed environmental requirements could affect demand for the Group's products or the use of the Group's tangible fixed assets to any major degree. Certain Group companies pursue operations that require permits or are notifiable pursuant to the Swedish Environmental Code and are under the supervision of the appropriate authority. Hexagon has received permits and has fulfilled the applicable notification obligations.

### Financial risks
In its capacity as a net borrower and due to its extensive operations outside Sweden, Hexagon is exposed to various financial risks. The Group's finance policy indicates guidelines for financial exposure and how these should be managed in the Group. The Board formulates a finance policy for each year.

Hexagon's financial operations are centralized to the Group's internal bank, which is in charge of coordinating currency and interest rate exposure. The internal bank is also responsible for the Group's external borrowing and its internal financing. Centralization entails substantial economies of scale, lower financing costs and better control and management of the Group's financial risks. The internal bank has no mandate to conduct independent trading in currencies and interest rate instruments. The credit risk at the customer level is managed in each subsidiary.

A more detailed description of the Group's financial risks is presented in Note 17 on page 80.

### Currency risk
Pursuing operations outside Sweden entails currency risks. Changes in exchange rates affect Hexagon's earnings, in part when sales and purchases are made in different currencies (transaction exposure) and, in part, when the income statements and balance sheets of foreign subsidiaries are translated to Swedish kronor (translation exposure). In accordance with the finance policy, transaction exposure is eliminated as soon as it is identified, mainly through forward currency contracts. Other currency risks are subject to exchange rate hedging via loans or forward contracts in the net asset currency.

### Financing risk
Financing risk refers to the risk that Hexagon cannot meet its need for external capital. Securing these requirements demands a strong financial position in the Group, combined with active measures to ensure access to credit. Cash and cash equivalents, including unutilized credit limits, totalled 2 753 MSEK on 31 December 2007.

### Interest rate risk
The interest rate risk is the risk that changes in interest rates will adversely affect the Group's net interest expenses and/or the cash flow.

### Credit risk
The primary credit risk to which Hexagon is exposed is that a customer cannot settle its transactions with Hexagon. There is no substantial concentration of credit risks geographically or in terms of a particular customer segment.

### Sensitivity analysis
The Group's earnings are affected by changes in certain key factors, as reviewed below. The calculations proceed from the conditions prevailing in 2007 and the effects are expressed on an annualized basis. Earnings in foreign subsidiaries are converted to Swedish kronor based on average exchange rates for the period the earnings arise.

During the year, the average exchange rate for CHF deteriorated by slightly more than 4 per cent. Since Hexagon has negative exposure in terms of CHF, the decline had a favourable impact on earnings. This was offset by Hexagon's positive exposure in terms of USD, for which the average exchange rate deteriorated by slightly more than 8 per cent.

During 2007, total net cash flow from operations in foreign currencies amounted to an equivalent of 2 154 MSEK. An appreciation in the exchange rate for SEK by 1 per cent against all other foreign currencies, would have an adverse effect on operating earnings of approximately 21 MSEK.

A 1 per cent change in sales prices would affect revenues and operating earnings by approximately 146 MSEK. A 1 per cent change in payroll expenses including social security contributions would affect operating earnings by approximately 38 MSEK.

Based on the average interest fixing period in the Group's total loan portfolio as of year-end 2007, a simultaneous 1 percentage point change in interest rates in all of Hexagon's funding currencies would exert an impact of about 70 MSEK on pre-tax full-year earnings.

» The AGM approved the Board's motion to pay a dividend of 5.00 SEK per share. Monday 7 May 2007 was approved as the record date for dividends.

» The AGM resolved to re-elect Melker Schörling, Maths O. Sundqvist, Henrik Didner (Didner & Gerge Funds) and Anders Algotsson (AFA Försäkring) and to newly elect Marianne Nilsson (Swedbank Robur) as members of the Nomination Committee ahead of the AGM in 2008, with Melker Schörling appointed chairman of the Nomination Committee.

» The AGM resolved on the establishment of guidelines for the remuneration of senior executives, essentially entailing that such remuneration should comprise a basic salary, variable re-muneration, other benefits and pension, and that in total this remuneration should be commercially viable and competitive in the market. The variable remuneration should be maxi-mized in relation to the basic salary, connected to the earn-ings trend that the individual can influence and be based on the outcome in relation to individually established targets.

» The AGM resolved to implement a non-cash issue, whereby the company's share capital would be increased by a maxi-mum of 520 000 SEK through the issue of a maximum of 130 000 class B shares. The background to this non-cash issue was that in connection with Hexagon's acquisition of Leica Geosystems in October 2005, there were approximately 90 000 issued and unredeemed options in Leica Geosystems that had been granted to employees of the former Leica Geosystems Group.

» The AGM resolved to implement changes in the company's share capital in the Articles of Association and to carry out a split. The AGM also resolved to specify the location of the registered office of the Board.

» The AGM resolved to increase the company's share capital through a bonus issue, without issuance of new shares. After registration of the aforementioned non-cash issue, the com-pany's share capital will amount to 353 799 980 SEK, with 176 899 990 SEK to 530 699 970 SEK through transfer of the said amounts from the statutory reserve. The aim of the bonus issue was to create a nominal value for the shares that was equally divisible by three prior to the proposed split.

» The AGM resolved to divide the company's shares in such a way that each share would be split into three shares of the same share class.

The notice and the documents presented at the 2007 AGM are available in Swedish and in English on the company's website.

### Extraordinary General Meeting in 2007

An Extraordinary General Meeting was held on 14 December 2007 in Stockholm, Sweden, and was attended by a total of 48 shareholders, who jointly represented 54.7 per cent of the total number of shares and 67.7 per cent of the total number of voting rights. Melker Schörling was elected chairman of the EGM. The EGM made the following principal resolution:

» The EGM resolved in accordance with the Board's motion to implement a subscription warrant programme for senior executives and key employees in the Group by means of a directed issue of 2 500 000 subscription warrants. The war-rants shall be transferred to approximately 80 senior execu-tives and key employees identified by the Board, at a price of 20 SEK per warrant and the remaining warrants shall be reserved for future recruitment of senior executives and key employees in the Group.

### Nomination Committee

At the AGM, a nomination committee is elected with the task of presenting proposals at the following AGM concerning the elec-tion of Chairman and other Members of the Board, the election of chairman of the AGM, director fees divided among the Chairman and other Members of the Board and any related issues. The Nomination Committee also presents proposals regarding the election and fees to be paid to the auditors. In order to facilitate an efficient nomination process, the Nomina-tion Committee includes Board Members who also represent the principal shareholders.

The members of the Nomination Committee ahead of the 2008 AGM, presented on the company's website, are as follows:

» Melker Schörling (Chairman)
» Maths O. Sundqvist
» Henrik Didner, Didner & Gerge Funds
» Anders Algotsson, AFA Försäkring
» Marianne Nilsson, Swedbank Robur

In the event that a replacement is required for a member who leaves the Nomination Committee before its work has been completed, the Nomination Committee is entitled to replace such a member with another representative elected from among the major shareholders in terms of voting rights. During the year, the Nomination Committee held one minuted meeting at which the chairman made a presentation of the evaluation pro-cess. The Committee discussed desirable changes and decided on proposals to submit to the 2008 AGM concerning the elec-tion of chairman of the AGM, the election of Chairman and other Members of the Board, directors fees, remuneration for committee work and the election of auditors.

Shareholders wishing to submit proposals have been able to do so by contacting the Nomination Committee by post. No remuneration was paid to the members of the Nomination Committee for their work.

### Board of Directors

The Articles of Association stipulate that Hexagon's Board must comprise a minimum of three and maximum of nine regular members. These members are elected annually at the AGM for the period until the following AGM has been held. At the 2007 AGM, six members were elected, including the CEO. The Board

Number of meetings and attendance 2007

| Name | Function | Elected | Audit Committee | Remuneration Committee | Board Meetings | Independence | Shares [1] |
|------|----------|---------|-----------------|------------------------|----------------|--------------|-----------|
| Melker Schörling | Chairman | 1999 | – | 1 | 14 | In relation to the company and management | A: 11 812 500 [2] B: 50 415 654 [2] |
| Marianne Arosenius [3] | Member | 2004 | 1 | – | 6 | In relation to the company, management and the company's major shareholders | B: 2 886 |
| Mario Fontana | Member | 2006 | 3 | – | 11 | In relation to the company, management and the company's major shareholders | B: 60 195 |
| Ulf Henriksson [4] | Member | 2007 | – | – | 10 | In relation to the company, management and the company's major shareholders | – |
| Ola Rollén | Member President and CEO | 2000 | – | – | 14 | In relation to the company's major shareholders | B: 2 731 152 |
| Maths O. Sundqvist | Member | 1991 | – | 1 | 12 | Not independent [5] | B: 39 000 000 |

[1] At 31 December 2007. [2] Shares owned through Melker Schörling AB. [3] Resigned from the Board at her own request in August 2007. [4] Elected in May 2007.
[5] Member of the Board for more than 12 years.

Members possess excellent financial know-how and broad international experience of the engineering technology business.

Chairman of the Board Melker Schörling is the principal owner of Melker Schörling AB, which controls slightly more than 45 per cent of the voting rights in Hexagon. The company's second largest owner, Maths O. Sundqvist, who controls slightly more than 10 per cent of the voting rights in Hexagon through companies, is also Member of the Board. The other Board Members, with the exception of one Member, also have direct or indirect shareholdings in the company, which ensures considerable personal commitment to Hexagon's development.

All Board Members are presented in greater detail on page 48 and can be reached at the address of Hexagon's Head Office.

## Responsibilities of the Board of Directors

The Board is responsible for determining the overall objectives for the company's operations, developing and monitoring the company's overall strategy, decisions concerning major company acquisitions, divestments and investments, and ongoing monitoring of operations during the year. The Board is also responsible for ongoing evaluation of the company's management, the presence of effective systems for monitoring and internal control of the company's operations and financial position, the Group's organizational structure and administration pursuant to the Swedish Companies Act.

Procedural rules and instructions have been formulated for the Board and the CEO, which govern those issues requiring Board approval, and for the financial information and other reporting to be submitted to the Board. These issues are addressed and resolved on an annual basis.

The Chairman of the Board is appointed by the AGM. The Chairman directs the Board's activities to ensure that they are conducted pursuant to the Swedish Companies Act, the prevailing regulations for listed companies and the Board's internal control instruments.

## Board activities in 2007

In 2007, the Board held 14 minuted meetings, including the statutory Board meeting. At all scheduled Board meetings, the CEO and representatives of company management present to the Board information concerning the Group's financial position and important events affecting the company's operations.

The company's auditors attended the first Board meeting of the year and reported their observations from their examination of the Group's internal controls and financial statements for 2006. The major matters addressed by the Board during 2007 included the following:

| | |
|--|--|
| 12 February | Financial statements for 2006 |
| 19 April | Decisions concerning acquisition of Jigsaw, ER Mapper and JMTC |
| 2 May | Interim report, first quarter |
| 2 May | Statutory Board meeting |
| 11 May | Decision concerning acquisition of IONIC |
| 22 May | Decisions concerning allotment of shares, non-cash issue |
| 8 June | Decision concerning listing of Polymers and acquisition of Gold Key |
| 9 August | Interim report, second quarter, decision concerning acquisition of CogniTens |
| 24 September | Decisions concerning acquisition of Rost, Geopro and Junglas |
| 1 October | Decision concerning acquisition of NovAtel Inc. |
| 25 October | Interim report, third quarter, decision concerning acquisition of Elcome Technologies |
| 13 November | Decision concerning Extraordinary General Meeting and proposal concerning warrants programme |
| 29 November | Adoption of proposal concerning warrants programme |
| 20 December | Budget 2008 and strategic discussion |

### Director fees

Pursuant to a resolution by the AGM, the Chairman of the Board and other Board Members received remuneration totalling 2 425 000 SEK for 2007. The Chairman received 650 000 SEK and the other Board Members each received 350 000 SEK, apart from the CEO, who does not receive any director fees.

The chairman of the Remuneration Committee received 75 000 SEK and each member of this Committee received 50 000 SEK. The chairman of the Audit Committee received 150 000 SEK and each member of this Committee received 100 000 SEK.

### Evaluation of Board activities

The Board continuously evaluates its work and the forms for conducting its activities. This evaluation considers factors such as how the Board's work can be improved, whether the character of meetings stimulates open discussion, and whether each Board Member participates actively and contributes to discussions. Since the Board comprises a small number of members, this evaluation is effected through ongoing discussions between the members. The evaluation is coordinated by the Chairman of the Board, who also continuously evaluates each individual member's input and skills. The Board is also evaluated within the framework of the Nomination Committee's activities.

### Board committees

#### Remuneration Committee

On behalf of the Board, the task of the Remuneration Committee is to consider issues regarding the remuneration of the CEO and the executives that report directly to the CEO, and other similar issues assigned by the Board for consideration. The Remuneration Committee obtains supporting data and views from, among others, other Board Members, the CEO and the CFO. The Committee also obtains comparable supporting data from external consultants.

During the year, the Remuneration Committee comprised Melker Schörling (Chairman) and Maths O. Sundqvist.

During 2007, the Remuneration Committee held one minuted meeting:

| 10 January | Terms of employment for the CEO and Group Management |

#### Audit Committee

On behalf of the Board, the purpose of the Audit Committee is to consider issues relating to the procurement and remuneration of auditors, to consider plans for auditing work and the reports made by the auditors, to quality assure the company's financial reporting and other information, and to meet the company's auditors on an ongoing basis to keep itself informed of the orientation and scope of the audit. The Audit Committee's tasks also include monitoring the activities of the external auditors and the company's internal control systems, monitoring the current risk situation and the company's financial information, and monitoring other issues the Board assigns the Committee to consider.

The Audit Committee continuously obtains information and supporting data from the Board Members, CEO, CFO and the company's external auditors. The Committee also familiarizes itself with all reports from the external auditors and follows up these reports internally and with the auditors.

During the year, the Audit Committee comprised Marianne Arosenius (Chairman) and Mario Fontana. In August, after Marianne Arosenius had resigned from the Board at her own request and thus also from the Audit Committee, Mario Fontana was appointed chairman. The Committee's member is independent of the company, its management and the company's major shareholders.

During 2007, the Audit Committee held four minuted meetings:

| 5 February | Annual accounts 2006 |
| 20 September | Focus of the audit in 2007 |
| 23 October | Auditors' fees in 2007 and procurement of audit for 2008–2011 |
| 19 December | Preparation of annual accounts |

### Auditors

The AGM appoints auditors every fourth year. On behalf of the shareholders, the auditors' task is to examine the company's Annual Report and accounting records and the administration of the Board of Directors and the CEO.

At the AGM on 5 May 2004, the accounting firm Ernst & Young AB, Sweden, was appointed for the period up to the AGM in 2008. Ernst & Young AB possesses the requisite expertise and is a member of FAR. Authorized Public Accountant Hamish Mabon (born in 1965) serves as auditor in charge. Hamish Mabon has participated in the assignment of auditing Hexagon since 2001. In addition to Hexagon, he conducts auditing assignments for such companies as If Skadeförsäkring, Relacom and Delaval International. Hamish Mabon has no active assignments in companies that are closely related to Hexagon's major shareholders or CEO.

During 2007, in addition to the audit, the auditors had other assignments in the form of work connected to acquisitions and divestments of operations.

The company's auditors attended the first Board meeting of the year, at which they reported observations from their examination of the Group's internal controls and the annual financial statements. Moreover, the auditors met the Board's Audit Committee on four occasions during the year.

The address of Hexagon's auditors is Ernst & Young AB, P. O. Box 7850, SE-103 99, Stockholm, Sweden. A complete statement of remuneration to the auditors over the past two years is published in Note 13 on page 79.

### Group Management

The CEO is responsible for leading and controlling Hexagon's operations in accordance with the strategy determined by the Board. The CEO has appointed a Group Management compris-

ing the CEO, the CFO and the Vice President of Strategy. Group Management is responsible for overall business development, and apportioning financial resources between the business areas, as well as matters involving financing and capital structure. Where necessary, specialist know-how from leading experts is also commissioned.

Members of Hexagon's Group Management are presented in greater detail on page 49, and can be reached via the address of Hexagon's Head Office.

In addition to members of Group Management, Hexagon's management comprises key personnel each with responsibility for one of the Group's product segments and geographical regions. Regular management team meetings constitute the Group's forum for implementing Group Management's overall controls down to a particular business operation and geographical region, and in turn, down to individual company level.

In financial terms, Hexagon's business operations and subsidiaries are controlled on the basis of the parameter that they can influence themselves, namely the return on capital employed. This requires that they focus on maximizing operating earnings, and minimizing their working capital. Hexagon's organizational structure is distinctly characterized by decentralization. Individual managers assume overall responsibility for their business, and pursue clearly stated objectives.

## Remuneration

Hexagon's guidelines concerning the remuneration of executives essentially entail that the remuneration comprise basic salary,

variable remuneration, other benefits and pension, which when considered on the whole are regarded as competitive in the market. The variable remuneration shall be maximized in relation to the basic salary, be connected to the Group's earnings trend in terms of what the particular individual can affect and be based on individually established goals.

The executive must normally provide six-months notice of termination of employment. If the company terminates the executive's employment, the period of notice and severance pay should not exceed a total of 24 months. Pension benefits shall be based on either defined-benefit or defined-contribution plans, or a combination of such plans, with individually set retirement ages, although never lower than 60 years.

In order to create the conditions for recruiting and retaining valuable skills within the company, an option programme has been formulated that provide the option holder with the right to participate in the potential future value growth in company's share. This programme also aims to enhance interest in the company's progress and stimulate continued loyalty to the company. In connection with the acquisition of Leica Geosystems, the Leica Geosystems Group already had existing option programmes targeted at the company's senior executives. The design of the programme that is still outstanding is described in the section on the Hexagon share, on page 35.

An EGM held during the year resolved to implement a subscription warrant programme for senior executives and key employees in the Group by means of a directed issue of 2 500 000 subscription warrants. These warrants shall be transferred to

### Hexagon's Group Management

|  | Employed | Class B shares |
|---|---|---|
| Ola Rollén, President and Chief Executive Office | 2000 | 2 731 152 |
| Håkan Halén, Chief Financial Officer | 2001 | 1 275 441 |
| Gert Viebke, Vice President of Strategy | 2000 | 1 277 667 |

### Remuneration, SEK 000s

|  | Year | Basic Salary | Variable Pay | Other Benefits | Pension | Other Remuneration | Total |
|---|---|---|---|---|---|---|---|
| Chief Executive Office | 2006 | 8 311 | 4 000 | – | 1 247 | – | 13 558 |
|  | 2007 | 9 111 | 4 000 | – | 1 370 | – | 14 481 |
| Other Senior Executives | 2006 | 10 132 | 4 091 | 511 | 2 550 | – | 17 284 |
|  | 2007 | 6 747 | 3 677 | 78 | 1 515 | – | 12 017 |

# EXHIBIT 2

search...

Home    About Us    Service and Support    News & Events    Contact Us    Site Map



Home    About Us

## About Us

- **Hexagon Metrology, Inc.**
- **The Hexagon Metrology Advantage**
- **Our Brands**
- **Environmental and Safety**
- **Career Opportunities**
- **Branded Clothing Store**

## Company Profile

**About The Hexagon Group**

Hexagon AB  is a global technology group with strong market positions within measurement technologies and polymers. The group has about 10,000 employees in 30 countries.  Hexagon AB is a publicly traded company with a primary listing in Sweden and secondary listing in Switzerland.

The Group is organized in two business areas:

- Hexagon Measurement Technologies
- Hexagon Polymers

Hexagon's vision is to be a market leader, ranking number one or number two, in each strategic business in order to generate growth and shareholder value. Hexagon's business concept is to operate businesses on a global basis that develop and market leading engineering technology products and services within measurement technologies and polymers. Hexagon's strategy is to be the most cost-efficient and innovative supplier, have the best management skills in the business and short and rapid decision processes.

**Hexagon Metrology, Inc.**
250 Circuit Drive
North Kingstown, RI 02852

Toll Free Phone: 800.343.7933
Phone: 401.886.2000
Fax: 401.886.2727
info@HexagonMetrology.us





**Hexagon Measurement Technologies**

The Measurement Technologies group, consisting of over 5,000 employees and over $1 billion in sales, there are two main focus areas; so-called "Macro Metrology," which is focused on dimensional measuring tasks on a large scale such as buildings, roads, and geographic features. The "Micro Metrology" group focuses on more precise dimensional measurement found in a wide variety of manufactured products such as automobiles, aircraft, machinery, defense, industrial products and consumer goods.

**Hexagon Metrology Group**

Hexagon Metrology is the designation for the business group focusing on Micro measuring products, and is the largest manufacturer of high-precision coordinate measuring systems and software worldwide.  Our world-renowned brands include Brown & Sharpe , CogniTens , DEA , Leica Geosystems (industrial metrology products), Leitz , ROMER , PC-DMIS , Sheffield , and TESA . An expansive worldwide presence includes more than ten manufacturing facilities on four continents, and more than fifty sales and support centers in major manufacturing markets worldwide. The website for the Hexagon Metrology group worldwide is www.HexagonMetrology.com .

**Hexagon Metrology in North America**

Hexagon Metrology, Inc. (North Kingstown, RI) is the North American based manufacturing, sales, service, and distribution company serving most Hexagon Metrology brands and products, including Brown & Sharpe, DEA, Leitz and Sheffield measurement systems, TESA hand tools and small 1D to 3D measuring machines,  products within the North American market area.   Hexagon Metrology Inc. has factories in North Kingstown, RI, and Fond du Lac, WI, plus sales and services offices in key manufacturing markets across the United States.

Portable measurement products (PCMM) such as articulated arm CMMs branded ROMER and laser trackers and theodoloites branded Leica are produced by ROMER, Inc. (Carlsbad, CA) and Leica Geosystems AG (Heerbrugg, Switzerland), respectively, and are sold by the Hexagon Metrology group sales force in North America.

Some of our brands are also sold in North America via independent representatives, agents and distributors.

CogniTens "white light" measurement systems are sold and supported by CogniTens, Inc , another company with the Hexagon Metrology group.

Hexagon Metrology S.A. de C.V. (Monterrey, Mexico) is our corporate office for sales, support and distribution in Mexico.



        

© 2008 Hexagon Metrology, Inc. | All Rights Reserved

Privacy Statement | Terms of Use

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RENISHAW PLC, | ) | **CONFIDENTIAL -** |
|  | ) | **ATTORNEYS' EYES ONLY** |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | Case No. 1:08-cv-03485 |
| TESA SA, and | ) | |
| HEXAGON METROLOGY, INC. (also dba | ) | Hon. Rebecca R. Pallmeyer |
| TESA USA, BROWN & SHARPE, INC., | ) | Presiding Judge |
| and SHEFFIELD MEASUREMENT, INC.), | ) | |
|  | ) | Hon. Nan R. Nolan |
| Defendants. | ) | Magistrate Judge |
|  | ) | |

## RENISHAW PLC'S OBJECTIONS AND RESPONSES TO
## DEFENDANT HEXAGON METROLOGY, INC.'S
## FIRST SET OF INTERROGATORIES (NOS. 1-16)

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiff Renishaw plc ("Renishaw") serves the

following Objections and Responses to Defendant Hexagon Metrology, Inc.'s ("Defendant" or

"Hexagon") First Set of Interrogatories (Nos. 1-16).

Each of the responses set forth herein is based on Renishaw's current information and belief.

These responses are subject to change, correction and/or supplementation on the basis of further

facts, information and circumstances that may come to Renishaw's attention.

## GENERAL OBJECTIONS

1.      Renishaw objects to Hexagon's Interrogatories to the extent that they seek to

impose upon Renishaw obligations and duties that are greater than those imposed by the Federal

Rules of Civil Procedure, the Local Rules for the United States District Court for the Northern

District of Illinois, or any Case Management Order entered by the Court in this case.

2.     Renishaw objects to Hexagon's Interrogatories to the extent that they seek information, documents and things that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or immunity from discovery under federal or state statutory, constitutional or common law.

3.     Renishaw objects to Hexagon's Interrogatories to the extent that they are not based on the ordinary and customary meaning of the words and terms used therein, and Renishaw, in responding to the Interrogatories, construes the words and terms used according to their ordinary and customary meanings.

4.     Renishaw objects to Hexagon's Interrogatories to the extent that they seek information that is not relevant to a claim or defense of any party in this action.

5.     Renishaw objects to Hexagon's Interrogatories to the extent they are not reasonably calculated to lead to the discovery of admissible evidence.

6.     Renishaw objects to Hexagon's Interrogatories to the extent that they purport to impose upon Renishaw a duty to search for and/or disclose information that is not within Renishaw's possession, custody or control.

7.     Renishaw objects to Hexagon's Interrogatories to the extent that they seek to require Renishaw to provide information beyond what is presently available to Renishaw either from its employees, or based on a reasonable search of its own files.

8.     Renishaw objects to Hexagon's Interrogatories to the extent they seek information that is a matter of public record or otherwise equally accessible to Renishaw and Hexagon.

9.     Renishaw objects to Hexagon's Interrogatories to the extent that they seek information that is obtainable from other sources that are more convenient, less burdensome and/or less expensive than obtaining such items from Renishaw.

10.     Renishaw objects to Hexagon's Interrogatories to the extent they call for Renishaw to provide confidential, proprietary or trade-secret information of third parties as to which disclosure may be prohibited, limited or restricted.

11.     Renishaw objects to Hexagon's Interrogatories to the extent they require or assume a legal conclusion.

12.     Renishaw objects to Hexagon's Interrogatories to the extent they assume the truth of facts at issue in this litigation.

13.     Renishaw objects to Hexagon's Interrogatories to the extent that they seek information, documents and things generated beyond the time period relevant to this litigation.

14.     Renishaw reserves all objections as to the competency, relevancy, materiality and admissibility of its responses, information, documents and things, or subject matter(s) thereof, all objections as to burdensomeness, vagueness, overbreadth and ambiguity, and all rights to object on any ground to the use of any response, information, document or thing, or subject matter(s) thereof, at the trial in this action or in any other proceeding.

15.     Renishaw's provision of information that is responsive to Hexagon's Interrogatories should not be construed as: (i) an admission or stipulation that the material is relevant or admissible into evidence; (ii) a waiver by Renishaw of its General Objections, or of its specific objections that are asserted in response to each Interrogatory; or (iii) an agreement that Requests for similar information will be treated in a similar manner.

16.     Renishaw's search for information responsive to Hexagon's Interrogatories is ongoing.  Any representation by Renishaw at this stage that documents or things will be produced in response to a particular Interrogatory shall not be construed as a representation that

any particular documents or things actually exist or are within Renishaw's possession, custody or control.

17.    To the extent particular objections are asserted in response to individual Interrogatories, such objections have been asserted because they are deemed particularly applicable to the subject Interrogatory; nonetheless, the assertion of a specific or general objection in response to a particular Interrogatory should not be deemed a waiver of any other objection that might otherwise be applicable.

18.    Renishaw objects to Instruction "B," which calls upon Renishaw to "set forth the full factual basis and explanation," as being overly broad and unduly burdensome, to the extent that it requires Renishaw to identify each and every document, or communication which forms any part of its response, and to state or describe any act or fact that forms any part of its response. Renishaw will either identify documents that are the most relevant to its response, or produce those documents to defendants, pursuant to Fed. R. Civ. P. 33(d).  Renishaw also objects to Instruction "B" to the extent that it requires Renishaw to identify *all* persons having knowledge of the facts relevant to the interrogatory.  Renishaw will instead identify those persons who are the most knowledgeable of the matters raised by a particular Interrogatory.

19.    Renishaw objects to Instruction "D" as being overly broad and unduly burdensome, because it purports to require Renishaw to provide information relating to information, documents or things for which it claims privilege or work product immunity that goes beyond the requirements of Fed. R. Civ. P. 26(b)(5).  Renishaw will provide a privilege log which includes the information required by this Rule at a mutually acceptable time to be agreed upon by the parties.

20.     Renishaw objects to Instruction "O(a)" as being unduly burdensome and
oppressive to the extent that it requires Renishaw to identify the residence address of any
individual.

21.     To the extent certain objections recite examples further describing the basis for
such objections, such examples are being provided for illustrative purposes only, the provision of
any such illustrative example should not be construed as comprising the sole basis for the
asserted objection.

22.     Renishaw hereby incorporates by reference these General Objections into each of
its specific objections and responses to Hexagon's Interrogatories below.

## SPECIFIC OBJECTIONS AND ANSWERS

### INTERROGATORY NO. 1

Describe in detail Plaintiff's investigation and/or examination of Hexagon's
TESASTAR-mp probes and identify all persons involved in such investigation and/or
examination, including all persons known to Plaintiff to have knowledge of facts that
relate to the alleged notification to "Hexagon of the 005 Patent in connection with the
TESASTAR-mp probe in Europe in December 2007" and the investigation leading up to
the alleged notice, including the substance of any such knowledge.

### RESPONSE TO INTERROGATORY NO. 1

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this
Interrogatory as being overly broad and unduly burdensome to the extent that it requests the
identity of "all persons" involved in the investigation or examination of Hexagon's TESASTAR-
mp probes and Renishaw's notification to Hexagon of the 005 Patent.  Renishaw also objects to
this Interrogatory as calling for the provision of information protected by the attorney-client
privilege and/or attorney work product doctrine.

Subject to and without waiver of the foregoing general and specific objections, Renishaw responds that its investigation leading up to the December 2007 notification to Hexagon of the 005 Patent in connection with the TESASTAR-mp probe included, *inter alia,* a review of publicly available brochures, product literature, data sheets and catalogs available from Hexagon, including those available on Hexagon's web site, which described, in pictorial or narrative form, the structure and operation of the TESASTAR-mp probe and the TESASTAR-pr probe rack. Renishaw also observed the TESASTAR-mp probe and TESASTAR-pr probe rack at trade shows, including the "Control 2007" and "EMO 2007" shows.

Prior to filing the complaint in this case, Renishaw reviewed the above-identified documents and information. Renishaw discovered that Hexagon displayed a TESASTAR-mp probe in the United States at the WESTEC show in Los Angeles which took place from March 31 to April 3, 2008. Renishaw thereafter purchased a TESASTAR-mp probe, and a TESASTAR-pr probe rack, from a distributor in the United States. Renishaw photographed this sample TESASTAR-mp probe on its own and in comparison to a Renishaw TP20 probe. Renishaw also x-rayed the sample TESASTAR-mp probe to ascertain its internal structures, components and functions. Renishaw then compared the internal and external structures, components and functions of the TESASTAR-mp probe to 005 Patent claims 1, 4 and 5. In addition, Renishaw tested the TESASTAR-mp probe's stylus module on a CMM by mounting it on the retaining module of a Renishaw TP20 probe to confirm that it functioned as a kinematic resistive probe of the type claimed by the 005 Patent.

After the complaint in this case was filed, Renishaw continued its investigation into the structure and operation of the TESASTAR-mp probe. Renishaw purchased four (4) TESASTAR-mp stylus modules and two (2) TESASTAR-mp retaining modules for analysis.

Renishaw disassembled one of the sample TESASTAR-mp stylus modules and one of the retaining modules in order to further study its internal structures, components and operation. As part of this study, Renishaw took photographs of the assembled and disassembled TESASTAR-mp stylus modules and retaining modules either on their own, or in comparison to the TP20 stylus module and retaining module. Renishaw also took x-rays of these sample TESASTAR-mp probes. These photographs and x-rays showed, *inter alia,* the assemblies, components and structures that are relevant to whether the TESASTAR-mp probe infringes the 005 and 230 Patents. Renishaw's analysis not only confirmed that the TESASTAR-mp probe is very similar in structure and operation to Renishaw's TP20 probe, but also that the TESASTAR-mp probe literally infringes 005 Patent claims 1, 4 and 5 230 Patent claim 1, for the reasons stated in Renishaw's motion for a preliminary injunction.

A detailed description of the pre-lawsuit investigation performed by Renishaw and the materials relied on by Renishaw is provided in the Somerville and McAlexander Declarations and their respective exhibits. Renishaw's Initial Disclosures also provide information concerning Renishaw's examination of the TESASTAR-mp probe, and the documents and things referred to or relied on by Renishaw in conducting such examination. In addition, the following individuals have knowledge of Renishaw's examination of the TESASTAR-mp probe, and/or Renishaw's provision of notice to Hexagon of the 005 Patent:

1)      Leo Somerville, Renishaw, Inc., has knowledge of the product literature, brochures, data sheets, catalogs, x-ray photographs and other materials obtained by Renishaw that describe the structure and function of the TESASTAR-mp probe and TESASTAR-pr probe rack. Mr. Somerville designed and supervised the testing of the sample TESASTAR-mp probe and TESASTAR-pr probe rack, as described in his Declaration.

2)      Joseph C. McAlexander, McAlexander Sound, Inc., has knowledge of the product literature, brochures, data sheets, catalogs and other materials obtained by Renishaw that describe the structure and function of the TESASTAR-mp probe and TESASTAR-pr probe rack.  Mr. McAlexander also performed tests on the sample TESASTAR-mp probe that he describes in his Declaration.

3)      Timothy Jackson, Renishaw plc, directed the x-raying of the sample TESASTAR-mp stylus module that was obtained by Renishaw, Inc. before the complaint was filed in this case, and he directed the disassembly and photographing of the TESASTAR-mp probes obtained by Renishaw after the complaint was filed.  Mr. Jackson also has knowledge of the investigation of the TESASTAR-mp probe by Renishaw prior to giving notice of the 005 Patent to Tesa SA in December 2007.

4)      Paul Dunn, Renishaw plc, supervised the x-raying of the TESASTAR-mp probes obtained by Renishaw both before and after the complaint was filed.

5)      Peter Hajdukiewicz, Renishaw plc, disassembled, inspected, and photographed a sample TESASTAR-mp probe, consisting of a stylus module and a retaining module, that was obtained by Renishaw after the complaint was filed.

6)      Graham Hellen, Renishaw plc, disassembled, inspected, and photographed a sample TESASTAR-mp probe, consisting of a stylus module and a retaining module, that was obtained by Renishaw after the complaint was filed.

7)      Representatives and employees of Hexagon and Tesa SA, including Bo Pettersson  Dr. Bernd-Günter Harmann, and Giovanni Gervasio, have knowledge about Renishaw's notification to Hexagon of the 005 Patent.

## INTERROGATORY NO. 2

Define "components, and/or accessories" as set forth in Plaintiff's [Proposed] Order for Preliminary Injunctive Relief and identify which Hexagon products meet this definition.

## RESPONSE TO INTERROGATORY NO. 2

Renishaw incorporates its General Objections.  Subject to and without waiving the

foregoing objections, the "components, and/or accessories" set forth in Renishaw's [Proposed]

Order for Preliminary Injunctive Relief include, without limitation, the TESASTAR-pr probe

racks, tightening keys for probe bodies, tightening keys for styli, styli, user guides, packaging,

and any other component and/or accessory marketed, sold or offered for sale by Hexagon in

conjunction with its TESASTAR-mp probes.  Renishaw will supplement its response to this

Interrogatory if and when it obtains discovery from Hexagon regarding what those components

and/or accessories are.

## INTERROGATORY NO. 3

Set forth the full factual basis and explanation for Plaintiff's contention that "it has been and will be" irreparably harmed by Hexagon's conduct.

## RESPONSE TO INTERROGATORY NO. 3

Renishaw incorporates its General Objections.  Renishaw also objects to this

Interrogatory as calling for the provision of information protected by the attorney-client privilege

and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Renishaw

refers Hexagon to paragraphs 21-57 of the Somerville Declaration, which provide a detailed

explanation concerning, *inter alia,* Renishaw's investment in its modular touch trigger probes, the

unqualified success and profitability of those probes, Hexagon's sale of modular TESASTAR-mp

9

probes which copy Renishaw's innovative patented designs, Hexagon's acquisition of major

Renishaw customers, and the nature of the competition between Renishaw and Hexagon

regarding these modular probes, all of which demonstrate how and why Renishaw has been and

will be irreparably harmed.

Renishaw has also produced documents as part of its Initial Disclosures which provide

further information concerning the nature and extent of the irreparable harm that it has or will

suffer as a result of Hexagon's conduct, which Renishaw relies on to respond to this Interrogatory

pursuant to Fed. R. Civ. P. 33(d).  Renishaw may also produce additional documents in response

to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that

provide further information concerning the irreparable harm that it has or will suffer, which

Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 4**

Set forth the full factual basis and explanation for Plaintiff's contention that it will
be unable to avoid significant business reductions, including "a significant reduction in its
market share," "a significant and permanent price reduction for its TP20 and TP200
probes" and "a reduction of its work force and production lines," based on Hexagon's
conduct, and provide a detailed description of (1) all the sales prices for Plaintiff's
modular touch trigger probes from 1990 to the present and (2) Plaintiff's percentage share
of the market for TP20 and TP200 probes and related touch probe products in comparison
to its competitors' share of that market.

**RESPONSE TO INTERROGATORY NO. 4**

Renishaw incorporates its General Objections.  Renishaw also objects to this

Interrogatory as calling for the provision of information protected by the attorney-client privilege

and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Renishaw

responds that it will be irreparably harmed because the TESASTAR-mp modular probe and

TESASTAR-pr probe rack compete directly with Renishaw's innovative and highly profitable TP20 and TP200 modular probes. Hexagon intends to capture a substantial portion of the market for modular touch trigger probe systems that is currently occupied by Renishaw. Renishaw sells its modular probes to several major customers, such as Sheffield Measurement and Brown & Sharpe, which are now owned by Hexagon. Sheffield Measurement and Brown & Sharpe are major manufactures of CMMs, including vision machines, and they either install modular touch trigger probes on these machines as original equipment, or offer these probes to their customers for use on these machines as options or replacement parts. This ownership relationship gives Hexagon an inherent competitive advantage over Renishaw because it threatens to replace Renishaw's modular probes with Hexagon's TESASTAR-mp probe systems in this vital supply chain to end users who now purchase Renishaw's TP20 and TP200 probes.

Hexagon also advertises its TESASTAR-mp probe as a direct alternative to Renishaw's TP20 and TP200 probes on CMMs, including vision machines, that Renishaw's subsidiaries sell to end users. Hexagon has also offered to sell the TESASTAR-mp probes to companies such as Metris and Wenzel, which it does not own, thus threatening to make further incursions into Renishaw's market share for modular probes. If successful, Hexagon's establishment of relationships with Renishaw's customers through Hexagon's sale of the TESASTAR-mp probe systems at each level of the supply chain will be difficult for Renishaw to reverse, making this harm irreparable.

This is not the first time that Hexagon purchased a Renishaw probe, created an equivalent probe, and then set about to replace the Renishaw probe with the Hexagon equivalent. Renishaw had previously developed a low specification probe ("LSP"), that is a basic kinematic resistive touch trigger probe. This LSP was known as the TP-ES and was branded for Hexagon's Brown

11

& Sharpe subsidiary. The TP-ES was intended for use on CMMs, and it incorporated the basic design elements of the kinematic resistive probe that were disclosed and claimed in Renishaw's foundational U.S. Patents Nos. 4,153,998 ("the 998 Patent") and 4,270,275 ("the 275 Patent"). As those Renishaw patents had expired, Hexagon created a probe that was the functional equivalent of the TP-ES, as it was free to do. That Hexagon probe was known as the original TESASTAR probe. After Hexagon's TP-ES equivalent had matured into a commercially saleable product, Hexagon stopped purchasing the TP-ES from Renishaw for use on the products that it sold. Hexagon apparently intends to do the same thing in this case by creating its own modular touch trigger probe, the TESASTAR-mp, that it will use to replace Renishaw's TP20 and TP200 probes on the CMMs, including vision machines, sold by it and its affiliates, and by other nonaffiliated companies such as Metris and Wenzel. Hexagon will have developed its TESASTAR-mp without investing the $9 million in development costs that Renishaw did to develop the TP20 and TP200 probes, thereby giving Hexagon a further competitive advantage.

    In order to compete with Hexagon under these circumstances, Renishaw will have no choice but to lower its price and provide other incentives to purchasers of its TP20 and TP200 probe systems in order to induce them to purchase these Renishaw products and not Hexagon's TESASTAR-mp. A reduction in price and/or market share for the TP20 and TP200 probes will cause a potentially substantial reduction in Renishaw's sales revenue and profitability, as those probe systems make a substantial contribution to Renishaw's overall financial performance, and its ability to continue to develop innovative products. In addition, if Renishaw experiences a reduction in its market share of touch trigger probes as a result of Hexagon's sales of the TESASTAR-mp probe system, Renishaw will necessarily have to scale back its production capacity for its TP20 and TP200 modular probe systems, requiring it to either redeploy or lay off

skilled employees and redeploy or idle capital assets such as machine tools. Once lost, these employees and capital assets will be difficult and costly to reacquire.

Renishaw also refers Hexagon to paragraphs 21-57 of the Somerville Declaration, which provide a detailed explanation concerning, *inter alia,* Renishaw's investment in its modular touch trigger probes, the unqualified success and profitability of those probes, Hexagon's sale of modular TESASTAR-mp probes which copy Renishaw's innovative patented designs, Hexagon's acquisition of major Renishaw customers, and the nature of the competition between Renishaw and Hexagon regarding these modular probes, all of which will necessarily result in a significant and permanent price reduction, as well as a reduction of market share for the TP20 and TP200 probes, and a reduction in Renishaw's work force and production lines.

Renishaw has also produced documents as part of its Initial Disclosures which provide further information concerning the nature and extent of the irreparable harm that it has suffered or will suffer as a result of Hexagon's conduct, which Renishaw relies on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d). Renishaw may also produce additional documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that provide further information responsive to this Interrogatory, which Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 5

Identify all "major CMM manufacturers and large end user companies" with which Plaintiff contends it has "long-standing customer relationships."

## RESPONSE TO INTERROGATORY NO. 5

Renishaw incorporates its General Objections.  Renishaw also objects to this

Interrogatory as calling for the provision of information protected by the attorney-client privilege

and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, the major

CMM manufacturers with which Renishaw has long-standing relationships include, for example:

a) Hexagon AB (*e.g.,* Brown & Sharpe, Sheffield Measurement, DEA, C.E. Johansson, and

Leitz), b) Mitutoyo, c) Wenzel, and d) Metris.  Renishaw also has longstanding relationships

with  end user companies, which include large manufacturers such as, for example: a) Ford

Motor Co., b) Caterpillar, and c) General Electric.

Renishaw may also produce documents in response to Hexagon's First Set of Requests for

Production of Documents and Things (Nos. 1-36), which Renishaw will rely on pursuant to Fed.

R. Civ. P. 33(d), to identify major CMM manufacturers and/or large end users with which

Renishaw has long-standing customer relationships.

## INTERROGATORY NO. 6

Set forth the full factual basis and explanation for Plaintiff's contention that
"substantial investments of financial and human capital by Renishaw in its innovative TP20
and TP200 touch trigger probes are jeopardized" by Hexagon's conduct, including the full
factual basis and explanation for Plaintiff's contention that it "devotes substantial
manufacturing capacity to the production of its TP20 and TP200 probes," and identify all
Renishaw employees who have "responsibility" for the TP20 and TP200 probes.

## RESPONSE TO INTERROGATORY NO. 6

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this

Interrogatory as being overly broad and unduly burdensome, to the extent that it requires

Renishaw to identify "all Renishaw employees" who have responsibility for the TP20 and TP200

probes. Renishaw also objects to this Interrogatory as calling for the provision of information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Renishaw responds that it has invested approximately $9 million in the design and development of its TP20 and TP200 modular touch trigger probes, which make a substantial contribution to Renishaw's overall revenue and profitability. Renishaw has also devoted substantial capital assets, in the form of manufacturing cells at its manufacturing facilities in England and Ireland, to the production of its TP20 and TP200 probes. Renishaw also employs the equivalent of 83 full-time employees who have responsibility for the development, manufacture, sale and marketing of the TP20 and TP200 modular probe systems. If Hexagon succeeds in increasing its share of the market by its sale of infringing TESASTAR-mp probe systems, this will necessarily result in a reduction in sales of the TP20 and TP200 probes. Such a reduction in sales of Renishaw's modular probes will, in turn, cause Renishaw to experience a reduction in its revenue and profitability, as well as a reduction in the rate of return that it experiences from its investment in the design, development and manufacture of the TP20 and TP200. Renishaw will also be required to redeploy or idle the manufacturing cells at its plants in England and Ireland that are currently used to produce the TP20 and TP200 probes, which will increase its costs and destroy the investment that Renishaw made in producing those probes. Renishaw will also have to redeploy or lay off skilled employees who are experienced in the development, manufacture, marketing and sale of the TP20 and TP200 modular probes. Once those assets and employees are lost, it will be very difficult and costly for Renishaw to regain that lost capability.

In addition, Renishaw refers Hexagon to paragraphs 21-57 of the Somerville Declaration, which provide a detailed explanation concerning, *inter alia,* Renishaw's investment in its

modular touch trigger probes, its devotion of substantial manufacturing capacity to those probes, the unqualified success and profitability of those probes, Hexagon's sale of modular TESASTAR-mp probes which copy Renishaw's innovative patented designs, Hexagon's acquisition of major Renishaw customers, and the nature of the competition between Renishaw and Hexagon regarding these modular probes, which demonstrate the nature and extent of the harm to Renishaw's substantial investment that has been or will be caused by Hexagon's conduct.

The following Renishaw employees have knowledge of the TP20 and TP200 probes:

1.    Leo Somerville, Renishaw, Inc., is knowledgeable of the investment made by Renishaw in the design, development, manufacture, and sale of the TP20 and TP200 probe systems.  Mr. Somerville is also knowledgeable of the marketing and servicing of the TP20 and TP200 probes in the United States.

2.    Gareth Hankins, Renishaw plc, has knowledge of the resources invested by Renishaw in the manufacture of the TP20 and TP200 probes and the jeopardy to that investment that would be caused by Hexagon's conduct.

3.    Caroline Pande, Renishaw plc, is the product manager currently responsible for the TP20 and TP200 probes.  Ms. Pande is responsible for the current design, development, and manufacture of those probes.

4.    Brian Gow, Renishaw plc, is knowledgeable of the worldwide marketing by Renishaw of the TP20 and TP200 probes.

Renishaw has also produced documents as part of its Initial Disclosures that provide further information concerning the nature and extent of the jeopardy to Renishaw's investment in the TP20 and TP200 probes that it has suffered or will suffer as a result of Hexagon's conduct. Renishaw relies on those documents to respond to this Interrogatory, pursuant to Fed. R. Civ. P.

33(d). Renishaw may also produce additional documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that will provide further information concerning the jeopardy to Renishaw's investment in its modular probe technology, which Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 7

Set forth the full factual basis and explanation for Plaintiff's contention that sales of its TP20 and TP200 probe systems "represent over 8% and over 25% of Renishaw's total revenue and profits" for "the financial year ending June 30, 2007 and the financial half-year ending December 31, 2007," including setting forth the full factual basis and explanation for Plaintiff's contention that "over $10 million in revenue and over $5 million in profit were generated by sales of the TP20 and TP200 systems in the United States."

## RESPONSE TO INTERROGATORY NO. 7

Renishaw incorporates its General Objections. Subject to and without waiver of those objections, Renishaw has produced documents as part of its Initial Disclosures that support the statements made in paragraph 25 of the Somerville Declaration, which Renishaw relies on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d). Renishaw may also produce additional documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that will provide further information concerning the statements in the Somerville Declaration, which Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 8

Set forth the full factual basis and explanation for Plaintiff's contention that any harms caused by Hexagon's conduct "would obviously not be rectified by awarding Renishaw monetary damages."

## RESPONSE TO INTERROGATORY NO. 8

Renishaw incorporates its General Objections.  Renishaw also objects to this Interrogatory as calling for the provision of information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Renishaw responds that the harm caused by Hexagon's infringing conduct would obviously not be rectified by awarding monetary damages because Renishaw may not be able to reestablish its customer relationships at each level of the modular probe supply chain as a result of Hexagon's efforts to replace Renishaw's modular touch trigger probe systems with its infringing TESASTAR-mp probe systems on machines that its affiliates manufacture, or those that are manufactured by third parties.  In addition, Renishaw may not be able to retain skilled and experienced employees as a result of redeployments or layoffs caused by Hexagon's sales of its infringing TESASTAR-mp probes.  Renishaw may also be required to retool or idle those manufacturing cells in its facilities in England and Ireland that are devoted to the production of the TP20 and TP200 probe systems.  Once that manufacturing capability is lost, it may be difficult or prohibitively expensive to reestablish, even if monetary damages are awarded for Hexagon's infringement.

In addition, Renishaw refers Hexagon to paragraphs 21-57 of the Somerville Declaration, which provide a detailed explanation concerning, *inter alia,* Renishaw's investment in its modular touch trigger probes, the unqualified success and profitability of those probes, Hexagon's sale of modular TESASTAR-mp probes which copy Renishaw's innovative patented designs, Hexagon's acquisition of major Renishaw customers, and the nature of the competition between Renishaw and Hexagon regarding these modular probes, all of which demonstrate how

and why the injury to Renishaw is irreparable, and will not be compensated for by an award of monetary damages.

Renishaw has also produced documents as part of its Initial Disclosures which provide further information concerning the nature and extent of the irreparable harm that it has suffered or will suffer as a result of Hexagon's conduct, which Renishaw relies on to respond to this Interrogatory, pursuant to Fed. R. Civ. P. 33(d).  Renishaw may also produce additional documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that provide further information concerning the irreparable nature of the harm to Renishaw, which Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 9

Describe in detail Plaintiff's licensing policies, including identifying all persons known to Plaintiff to have knowledge of those licensing policies, including the substance of any such knowledge, and all licensing agreements to which Renishaw is a party.

## RESPONSE TO INTERROGATORY NO. 9

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it requires Renishaw to identify "all persons known to Plaintiff" to have knowledge of its licensing policies and "all license agreements to which Renishaw is a party," regardless of their relevance to this case.

Subject to and without waiving the foregoing general and specific objections, Renishaw responds that (1) it regularly obtains and enforces patents in order to protect the valuable commercial fruits of its research and development activities, and (2) it is its general policy to maintain its patent exclusivity regarding the manufacture, use, importation, and sale of touch

trigger probes covered by the claims of its patents by not licensing those patents to others, and that policy has been followed with respect to the 005 and 230 Patents. However, in certain limited circumstances, Renishaw will work with particular customers to license particular Renishaw patents that are necessary for that customer to fully utilize Renishaw's products. In a few instances, Renishaw has also granted licenses to third parties as part of the settlement of a litigation or other dispute. On occasion, Renishaw has also licensed a patent of a third party that Renishaw would like to use for its own business.

Hexagon is also referred to paragraph 23 of the Somerville Declaration concerning Renishaw's licensing policies. Persons with knowledge of Renishaw's licensing policies and/or the non-licensing of the 005 Patent and the 230 Patent are:

1.    Leo Somerville, Renishaw, Inc., is knowledgeable of Renishaw's general licensing policies.

2.    Sir David McMurtry, Renishaw plc, is knowledgeable of Renishaw's general licensing policies.

3.    Geoff McFarland, Renishaw plc, is knowledgeable of Renishaw's implementation of its general licensing policies.

4.    Timothy Jackson, Renishaw plc, is knowledgeable of Renishaw's licensing policies and Renishaw's patent licenses, including the non-licensing of the 005 and 230 Patents. He is also knowledgeable of the exceptions to Renishaw's general policy not to license its patents that are described above.

Renishaw may also produce documents responsive to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that will provide further information

concerning its licensing policies, which Renishaw will also rely on to respond to this

Interrogatory, pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 10

Set forth the full factual basis and explanation for Plaintiff's contention that it "invested nearly $9 million in [the TP20 and TP200 probes'] design, development and manufacture since late 1990," including identifying all persons known to Plaintiff to have knowledge of facts that relate to the development of the TP20 and TP200 probes, including the substance of any such knowledge.

## RESPONSE TO INTERROGATORY NO. 10

Renishaw incorporates its General Objections.  Renishaw also objects to this

Interrogatory as being overly broad and unduly burdensome to the extent that it requires

Renishaw to identify "all persons known to Plaintiff to have knowledge of facts that relate to the

development of the TP20 and TP200 probes."  Subject to and without waiver of the foregoing

general and specific objections, persons with knowledge of the development of the TP20 and

TP200 probes are:

1.    Leo Somerville, Renishaw, Inc., is knowledgeable of Renishaw's investment in

the design, development, and manufacture of the TP20 and TP200 probes.

2.    Andy Souter, Renishaw plc, is knowledgeable of the Renishaw financial

information that demonstrates the amount of investment by Renishaw in the design, development

and manufacture of its TP20 and TP200 probes

Renishaw has also produced documents as part of its Initial Disclosures that support the

statements made in paragraph 32 of the Somerville Declaration concerning Renishaw's

investment in the TP20 and TP200 probes, which Renishaw relies on to respond to this

Interrogatory pursuant to Fed. R. Civ. P. 33(d).  Renishaw may also produce additional

documents in response to Hexagon's First Set of Requests for Production of Documents and

Things (Nos. 1-36) that will provide further information concerning its investment in the design,

development and manufacture of the TP20 and TP200 probes, which Renishaw will rely on to

respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 11

Identify all persons known to Plaintiff to have knowledge of facts that relate to the
development of the Autochange Flexible Probing System (which includes the Autojoint
System, Autochange System, Autochange Interfacing, Autochange Multisystem, the
storage rack, the TP1, TP2, TP6, and TP7 probes, the PH6, PH9 probe heads, and the M8
coupling), including the substance of any such knowledge.

## RESPONSE TO INTERROGATORY NO. 11

Renishaw incorporates its General Objections. In addition, Renishaw objects to this

Interrogatory to the extent that it requires Renishaw to identify persons knowledgeable of the

development of the Autochange Flexible Probing System and the individually identified

products, which development is not relevant to any claim or issue in this case. Renishaw also

objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it

requires identification of "all persons known to Plaintiff to have knowledge of facts that relate to

the development" of these Renishaw products. Subject to the foregoing objections, persons with

knowledge of the structure, operation and application of products listed in this Interrogatory are:

1.      Leo Somerville, Renishaw, Inc., has knowledge of the structure, operation, and

application of each of the listed products.

2.      David Wallace, Renishaw plc, has knowledge of the structure, operation, and

application of each of the listed products.

## INTERROGATORY NO. 12

Describe in detail Plaintiff's knowledge of any interchangeable or releasable
probing systems for coordinate measurement machines, whether manufactured by Plaintiff
or not.

## RESPONSE TO INTERROGATORY NO. 12

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it requests information concerning interchangeable or releasable probing systems for CMMs that are of a type that is not relevant to any claim or issue in this case.  Renishaw also objects to this Interrogatory as being vague and ambiguous, because it fails to define what is meant by "interchangeable and/or releasable probing systems."

Subject to and without waiving the foregoing general and specific objections, Renishaw has knowledge of its own probe and probe module changing products, e.g., its Autochange Flexible Probing System, TP20, and TP200, and Hexagon's TESASTAR probe and probe module changing products.  In addition, Renishaw refers Hexagon to the Somerville and McAlexander declarations, and their respective descriptions of the Renishaw TP20 and TP200 probes, the Renishaw TP2, TP6 and TP7 probes, and the TESASTAR-mp probes manufactured and sold by Hexagon.

Renishaw has also produced documents as part of its Initial Disclosures which provide further information concerning at least some of the foregoing products, which Renishaw relies on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).  Renishaw may also produce additional documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) concerning the foregoing products, which Renishaw will rely on to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 13

Describe in detail Plaintiff's conception and reduction to practice for the `005 Patent, including the earliest date of conception and reduction to practice and all persons having knowledge of same, including the substance of any such knowledge.

## RESPONSE TO INTERROGATORY NO. 13

Renishaw incorporates its General Objections. In addition, Renishaw objects to this

Interrogatory as being overly broad and unduly burdensome to the extent that it requires

Renishaw to identify "all persons having knowledge" of the conception and reduction to practice

of the 005 Patent. Renishaw also objects to this Interrogatory as calling for the provision of

information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiver of the foregoing general and specific objections,

conception and reduction to practice for the 005 Patent are evidenced, *inter alia*, by the 005

Patent application, and the U.S., PCT, and foreign applications upon which the 005 Patent relies

for priority, and the earliest dates are at least as early as reflected in those documents, and

possibly earlier (subject to further investigation and possible updating of this Response). Those

documents were produced as part of Renishaw's Initial Disclosures, and Renishaw relies on them

to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

The persons who conceived and were at least involved in a constructive reduction to

practice of the 005 Patent are:

1. Sir David R. McMurtry.

2. David Wilson.

3. Peter K. Hellier.

4. Peter Hajdukiewicz

Renishaw may also produce documents in response to Hexagon's First Set of Requests for Production of Documents and Things (Nos. 1-36) that provide further information concerning the conception and reduction to practice of the 005 Patent, which Renishaw will rely on to respond to this Interrogatory under Fed. R. Civ. P. 33 (d).

## INTERROGATORY NO. 14

Describe in detail Plaintiff's conception and reduction to practice for the `230 Patent, including the earliest date of conception and reduction to practice and all persons having knowledge of same, including the substance of any such knowledge.

## RESPONSE TO INTERROGATORY NO. 14

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it requires Renishaw to identify "all persons having knowledge" of the conception and reduction to practice of the 230 Patent.  Renishaw also objects to this Interrogatory as calling for the provision of information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiver of the foregoing general and specific objections, conception and reduction to practice for the 230 Patent are evidenced, *inter alia,* by the 230 Patent application, and the U.S., PCT, and foreign applications upon which the 230 Patent relies for priority, and the earliest dates are at least as early as reflected in those documents, and possibly earlier (subject to further investigation and possible updating of this Response).  Those documents were produced as part of Renishaw's Initial Disclosures, and Renishaw relies on them to respond to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).

The persons who conceived and were at least involved in a constructive reduction to practice of the 230 Patent are:

1.      Sir David R. McMurtry.

2.    Graham A. Hellen.

3.    Jonathan S. Sullivan.

Renishaw may also produce documents in response to Hexagon's First Set of Requests for

Production of Documents and Things (Nos. 1-36) that will provide further information

concerning the conception and reduction to practice of the 230 Patent, which Renishaw will rely

on to respond to this Interrogatory under Fed. R. Civ. P 33(d).

## INTERROGATORY NO. 15

Identify all of Plaintiffs competitors, its competitors' probe systems that compete with the
TP20 and TP200, and which of these competing probe systems do not infringe the `005 Patent or
the `230 Patent.

## RESPONSE TO INTERROGATORY NO. 15

Renishaw incorporates its General Objections.  Subject to and without waiver of the

foregoing objections, the only entities that Renishaw is aware of that sell a product in the United

States that competes with Renishaw's unique modular TP20 and TP200 touch trigger probes are

Hexagon Metrology, Inc. (also dba TESA USA, Brown & Sharpe, Inc. and Sheffield

Measurement, Inc.) and TESA SA whose modular TESASTAR-mp probe infringes the 005 and

230 Patents, and is marketed as a component of CMMs, including vision machines, that is

interchangeable with the TP20 and TP200.  *See* Exhibit J to the Somerville Declaration.

Renishaw is not aware of any other competing modular touch trigger probes.

## INTERROGATORY NO. 16

Identify any fact or expert witnesses Plaintiff intends to have testify at any hearing or
trial, including claim construction or preliminary injunction hearings.

**RESPONSE TO INTERROGATORY NO. 16**

Renishaw incorporates its General Objections.  In addition, Renishaw objects to this Interrogatory as being premature, overly broad and unduly burdensome to the extent that it requires Renishaw to identify any fact or expert witness that Plaintiff intends to have testify at trial, or at any hearing other than the preliminary injunction hearing that is currently scheduled for October 8, 2008.  Renishaw will identify witnesses it intends to call at trial or at any other hearing at an appropriate time in the future when it has determined who those witnesses will be.

Subject to and without waiver of those objections, Renishaw currently expects that it may have the following witnesses testify at the preliminary injunction hearing, either in person or by deposition:

1. Leo Somerville.

2. Joseph C. McAlexander.

3. Any witness for Hexagon or Tesa that provides testimony that supports Renishaw's entitlement to a preliminary injunction.


Dated:    July 22, 2008              By: _____
                                          James A. Oliff
                                          Edward P. Walker
                                          John W. O'Meara
                                          Aaron L Webb
                                          John A. Radi
                                          OLIFF & BERRIDGE, PLC
                                          277 South Washington Street, Suite 500
                                          P.O. Box 19928
                                          Alexandria, Virginia 22314
                                          Telephone:  (703) 836-6400

Patrick G. Burns, Esquire
B. Joe Kim
GREER, BURNS & CRAIN, LTD.
300 South Wacker Drive
25th Floor
Chicago, Illinois 60606
Telephone: (312) 360-0080
Facsimile: (312) 360-9315

*Attorneys for Plaintiff Renishaw plc*

## VERIFICATION

I, Timothy Jackson, hereby state that I am the Chief Patent Attorney of Renishaw, plc ("Renishaw"), the Plaintiff in the above-entitled action; that I have reviewed Renishaw's above interrogatory responses; and that the responses are true to the best of my knowledge, information and belief, although the truth of all of said responses is not known to me personally but said responses are based in whole or in part upon information received from others.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July ___, 2008.


_____

Timothy Jackson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **RENISHAW PLC'S OBJECTIONS AND RESPONSES TO DEFENDANT HEXAGON METROLOGY, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-16)** were served on the 22nd day of July on the following by e-mail and overnight courier:

> Alan L. Barry
> Patricia K. Schmidt
> Jason A. Engel
> BELL, BOYD & LLOYD LLP
> 70 W. Madison Street, 3100
> Chicago, IL 60602
> (312) 372-1121
> abarry@bellboyd.com.
> pschmidt@bellboyd.com
> jengel@bellboyd.com
>
> Attorneys for Defendants

By: _Aaron L. Webb_ _____
      Aaron L. Webb, Esq.

# EXHIBIT 4



"PETTERSSON Bo "
<bo.pettersson @hexagonmetr
ology.com>

07/01/2008 08:20 AM

To   "Collin Webb\(Collin.Webb@gi.leicageosystems.com\)"
<Collin.Webb@gi.leica-geosystems.com>

cc

bcc

Subject   FW: Renishaw / Hexagon meeting (email no.2 of 3)

Hi Collin,

The next mail

Regards
Bo

---

**From:** Tim Jackson [mailto:Tim.Jackson@Renishaw.com]
**Sent:** 13 December 2007 14:38
**To:** Pettersson, Bo; tech@bkp.li
**Subject:** Renishaw / Hexagon meeting (email no.2 of 3)
**Sensitivity:** Confidential


To:   Mr Bo Pettersson, Hexagon Metrology
        Dr Bernd-Günter Harmann, patent attorney, BK&P

CONFIDENTIAL


Dear Mr Pettersson / Dear Dr Harmann

We look forward to seeing you here at Renishaw next Tuesday, 18th December.

In preparation for our meeting, we wanted to make you aware of certain further patents and patent applications, as follows.  We are sending copies of all these documents (with amended claims where appropriate).  In view of the file sizes, some of the documents are sent with further copies of this email.

- US Patent No. 5,505,005.

- US Patent No. 7,024,783.  We have applied to re-issue this patent, with additional claims.

- Applications corresponding to US Patent No. 7,024,783 are pending in Japan, China and the European Patent Office.  We attach a copy of the international PCT application WO 03/083407.


As we have previously mentioned, we have a large number of pending applications relating to our Revo technology.  Of these, we would like to draw attention to the following:

- International PCT application WO 2007/107776

- International PCT application WO 2007/107777

- International PCT application WO 2006/114570 [+ amended US claims]

- International PCT application WO 2006/115923 [+ amended US claims]

- International PCT application WO 2006/114567 [+ amended US claims]

Yours sincerely

Tim Jackson
Chief Patent Attorney
Renishaw plc
New Mills, Wotton-under-Edge
Gloucestershire GL12 8JR
United Kingdom

Tel: +44 (0) 1453 524461     Fax: +44 (0) 1453 524051

<<WO2007107776A1.pdf>> <<WO2007107777A1.pdf>> <<WO2006114570A1.pdf>> <<WO2006114570

US claims.rtf>>   WO2007107776A1.pdf  WO2007107777A1.pdf  WO2006114570A1.pdf  WO2006114570 US claims.rtf

# EXHIBIT 5

Case 1:08-cv-03485    Document 4112    Filed 08/12/08    Page 71 of 97



US 20060119833A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2006/0119833 A1

Hinderling et al. (43) **Pub. Date:** **Jun. 8, 2006**

(54) **METHOD AND DEVICE FOR DERIVING GEODETIC DISTANCE DATA**

(75) Inventors: **Jurg Hinderling**, Marbach (CH); **Paul Benz**, Diepoldsau (CH); **Martin De Lange**, Kesswil (CH)

Correspondence Address:
**OLIFF & BERRIDGE, PLC**
**P.O. BOX 19928**
**ALEXANDRIA, VA 22320 (US)**

(73) Assignee: **LEICA GEOSYSTEMS AG**, Heerbrugg (CH)

(21) Appl. No.: **10/545,817**

(22) PCT Filed: **Jan. 27, 2004**

(86) PCT No.: **PCT/EP04/00682**

(30)         **Foreign Application Priority Data**

Feb. 19, 2003 (EP) ........................................ 03003738.6

**Publication Classification**

(51) **Int. Cl.**
  *G01C   3/08*    (2006.01)
  *G01B   11/26*    (2006.01)
(52) **U.S. Cl.** ...................... **356/5.11**; 356/5.01; 356/141.1

(57)              **ABSTRACT**

According to the invention, a light signal is emitted to one or several targets in order to derive geodetic distance data therefrom. Apparatus components such as transmitters (**1"**) and receivers (**4"**) are modeled along with the targets (**3***a* and **3***b*) as a linear, time-invariant system which is excited by means of a signal s(t) and the system response y(t) of which is recorded. Unlike in delay meters or phase meters, the distance data is derived from both the delay and the signal form of the system response.



# EXHIBIT 6

PATENT APPLICATION

**OLIFF & BERRIDGE, PLC**
Telephone:  (703) 836-6400
Facsimile:  (703) 836-2787

Attorney Docket No.:  126300

**CUSTOMER NUMBER 25944**

**AMENDMENT TRANSMITTAL**

In re the Application of

Bernhard BRAUNECKER et al.

Group Art Unit:  3662

Application No.:  10/560,432

Examiner:  L. RATCLIFFE

Filed:  January 30, 2006

For:  OPTICAL INCLINOMETER

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

Transmitted herewith is an Amendment in the above-identified application.

☐ Entitlement to small entity status is hereby asserted.

☐ Small entity status of this application has been established.

Any additional claim fees have been calculated as shown below:

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NO. PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY | | | | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | RATE | ADD'L FEE | OR | RATE | ADD'L FEE |
| TOTAL CLAIMS | *35 MINUS | **21 | = 14 | x  25 | $ | | x  50 | $  700 |
| INDEP CLAIMS | *2 MINUS | ***3 | = 0 | x  105 | $ | | x  210 | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | +  185 | $ | OR | +  370 | $ |
| | | | | | $ | | | $  700 |

\*    If the entry in Column 1 is less than the entry in Column 2, write "0" in Column 3.

\*\*   If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, write "20" in this space.

\*\*\*  If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, write "3" in this space.

The "Highest Number Previously Paid For" in this space (Total or Independent) is the highest number found from the equivalent box in Column 1 of a prior Amendment or the number of claims originally filed.

☒ Check No. 207247 in the amount of $700 is attached.  The Commissioner is hereby authorized to charge any other fees that may be required to complete this filing, or to credit any overpayment, to Deposit Account No. 15-0461.

Respectfully submitted,

James A. Oliff
Registration No. 27,075

Randi B. Isaacs
Registration No. 56,046

JAO:RBI/ldg
Date:  June 30, 2008

# EXHIBIT 7



PATENT APPLICATION

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of

Jurg HINDERLING et al.

Application No.:    11/287,390

Filed:  November 28, 2005                    Docket No.:    126152

For:    TARGET PLATE FOR POSITIONING COMPONENTS

## TRANSMITTAL OF POWER OF ATTORNEY AND
## STATEMENT UNDER 37 CFR § 3.73(b)

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

 Submitted herewith is a Power of Attorney from the Assignee.

 In compliance with 37 CFR §3.73(b), the undersigned hereby states that <u>LEICA</u>

<u>GEOSYSTEMS AG</u> is the assignee of the entire right, title and interest in the patent application

identified above by virtue of an assignment from the inventors of the patent application identified

above.  A copy of the assignment is attached hereto and is concurrently being submitted for

recordation.

 The undersigned is authorized to act on behalf of the assignee.

 In accordance with 37 CFR §1.36(a), submission of this Power of Attorney revokes any

powers of attorney previously given.

**ALL CORRESPONDENCE IN CONNECTION WITH THIS APPLICATION SHOULD
BE SENT TO OLIFF & BERRIDGE, PLC, CUSTOMER NO. 25944, TELEPHONE
(703) 836-6400.**

       Respectfully submitted,

       James A. Oliff
       Registration No. 27,075

       Randi B. Isaacs
       Registration No. 56,046

JAO:RBI/ojq
Date:  March 20, 2006

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## GENERAL POWER OF ATTORNEY

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Owner Name:             LEICA GEOSYSTEMS AG

hereby appoints the patent practitioners associated with Oliff & Berridge, PLC Customer

No. 53485 as attorneys of record to prosecute any and all patents and patent applications in

which this General Power of Attorney is filed, and all continuations and divisions thereof,

owned in whole or in part by the above-named owner, and to transact all business in the

Patent and Trademark Office.

    The undersigned is authorized to execute this document as or on behalf of the owner.

**ALL CORRESPONDENCE SHOULD BE SENT TO OLIFF & BERRIDGE, PLC,
CUSTOMER NO. 25944, TELEPHONE (703) 836-6400.**

_26.5. 2005_
Date

Signature

_SCHNEIDER KLAUS    VOIT EUGEN_
Typed Name:

Title: _IP-MANAGER        CTO_
(if acting on behalf of an Owner)

## ASSIGNMENT

| | | | |
|---|---|---|---|
| | (1) Jürg HINDERLING | (5) Klaus SCHNEIDER |
| **(1-8)** Insert Name(s) of Inventor(s) | (2) Peter KIPFER | (6) |
| | (3) Anton KEHL | (7) |
| | (4) Jeffrey Victor HARRINGTON | (8) |

In consideration of the sum of one dollar ($1.00) and other good and valuable consideration paid to each of the undersigned, each undersigned agrees to assign, and hereby does assign, transfer and set over to

**(9)** Insert Name of Assignee

(9) Leica Geosystems AG

**(10)** Insert Address of Assignee

(10) Heinrich-Wild-Strasse, CH-9435 Heerbrugg, Switzerland

(hereinafter designated as the Assignee) and Assignee's heirs, successors, assigns and legal representatives, the entire right, title and interest for the United States of America as defined in 35 U.S.C. §100, in the invention, and in all applications for patent including any and all provisional, non-provisional, divisional, continuation, international, confirmation, substitute and reissue application(s), and all Letters Patent, extensions, reissues and reexamination certificates that may be granted on the invention known as

**(11)** Insert Identification such as Title, Case Number, or Foreign Application Number

(11) TARGET PLATE FOR POSITIONING COMPONENTS

(Attorney Docket No. 126152 )

for which the undersigned has (have) executed an application for patent in the United States of America on even date herewith or

**(12)** Insert Date of Signing of Application

(12) on

**(13)** Alternative Identification for filed applications

(13) U.S. application Serial Number

filed November 28, 2005

1) Each undersigned agrees to execute all papers necessary in connection with any application and any continuing, divisional or reissue applications for the invention, and any patent(s) issuing thereon, and also to execute separate assignments in connection with such applications and patents as the Assignee may deem necessary.

2) Each undersigned agrees to execute all papers necessary in connection with any interference which may be declared concerning any application or continuation or division thereof, or any patent or reissue application based thereon, for the invention, and to cooperate with the Assignee in every way possible in obtaining evidence and going forward with such interference.

3) Each undersigned agrees to execute all papers and documents and perform any act which may be necessary in connection with claims or provisions of the International Convention for Protection of Industrial Property or similar agreements.

4) Each undersigned agrees to perform all affirmative acts which may be necessary to obtain, maintain or confirm by reissue or reexamination a grant of a valid United States patent to the Assignee.

5) Each undersigned authorizes and requests the Commissioner of the U.S. Patent and Trademark Office to issue any and all Letters Patents of the United States resulting from said application(s) to the said Assignee, as Assignee of the entire interest, and covenants that he has full right to convey the entire interest herein assigned, and that he has not executed, and will not execute, any agreements in conflict herewith, and agrees that this assignment is binding on him and his heirs, successors, assigns and legal representatives.

6) Each undersigned hereby grants the firm of CLIFF & BERRIDGE, PLC the power to insert on this assignment any further identification that may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office for recordation of this document.

**In witness whereof, executed by the undersigned on the date(s) opposite the undersigned name(s)**

| | | | | |
|---|---|---|---|---|
| Date | 8. Jan. 2006 | Inventor Signature | | (SEAL) |
| Date | 9. Jan. 2006 | Inventor Signature | | (SEAL) |
| Date | 10. Jan 2006 | Inventor Signature | | (SEAL) |
| Date | 23. Jan. 2006 | Inventor Signature | | (SEAL) |
| Date | 11 FEB 2006 | Inventor Signature | | (SEAL) ✕ |
| Date | | Inventor Signature | | (SEAL) |
| Date | | Inventor Signature | | (SEAL) |
| Date | | Inventor Signature | | (SEAL) |

This assignment should preferably be signed before: (a) a Notary Public if within the U.S.A. (b) a U.S. Consul if outside the U.S.A. If neither, then it should be signed before at least two witnesses who also sign here:

| | | | |
|---|---|---|---|
| Date | 20 Feb. 2006 | Witness | |
| Date | 20. Feb. 2006 | Witness | |

# EXHIBIT 8

# OLIFF & BERRIDGE, PLC

ATTORNEYS AT LAW

277 SOUTH WASHINGTON STREET, SUITE 500
ALEXANDRIA, VIRGINIA 22314

TELEPHONE: (703) 836-6400
FACSIMILE: (703) 836-2787

*V μc*
*40.06.08*

June 23, 2008

**Debit Note Number**
**461424**

BÜCHEL, KAMINSKI & PARTNER EST.
Austrasse 79
FL-9490 Vaduz, LIECHTENSTEIN

---

YOUR ACCOUNT HAS BEEN DEBITED AS FOLLOWS:

Re:    U.S. Patent Application No. 10/482,279
Inventor:    Holger KIRSCHNER
Our Ref.:    118147
Your Ref.:    HAP-5008-US

Services in connection with the above matter, including docketing Advisory
Action; reviewing Advisory Action; confirming that the Advisory Action was
pre-empted by the April 29 Final Rejection; reviewing Dr. Harmann's May 15
facsimile letter; June 3 facsimile letter to Dr. Harmann; June 16 facsimile letter to
Dr. Harmann; reviewing application file; preparing proposed Amendment After
Final Rejection and forwarding with June 17 facsimile letter to Dr. Harmann;
reviewing Dr. Harmann's June 19 facsimile letter; revising, finalizing and filing
Amendment After Final Rejection in the U.S. Patent and Trademark Office on
June 23; and June 23 facsimile letter to Dr. Harmann.

$    880.00

## DISBURSEMENTS

Miscellaneous expenses including duplication, postage and facsimile.    $    89.00

**TOTAL**    $    969.00 ✔

# EXHIBIT 9

**PATENT APPLICATION**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of

| | |
|---|---|
| David R. MCMURTRY et al. | Group Art Unit:   2859 |
| Application No.:   11/987,103 | Examiner: |
| Filed:  November 27, 2007 | Docket No.:    128256.01 |

For:    METHOD OF CALIBRATING A SCANNING SYSTEM

## TRANSMITTAL OF POWER OF ATTORNEY AND STATEMENT UNDER 37 CFR § 3.73(b)

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

Submitted herewith is a Power of Attorney from the Assignee.

In compliance with 37 CFR §3.73(b), the undersigned hereby states that RENISHAW PLC is the assignee of the entire right, title and interest in the patent application identified above by virtue of an assignment from the inventors of the patent application identified above.

The undersigned is authorized to act on behalf of the assignee.

In accordance with 37 CFR §1.36(a), submission of this Power of Attorney revokes any powers of attorney previously given.

**ALL CORRESPONDENCE IN CONNECTION WITH THIS APPLICATION SHOULD BE SENT TO OLIFF & BERRIDGE, PLC, CUSTOMER NO. 25944, TELEPHONE (703) 836-6400.**

Respectfully submitted,

James A. Oliff
Registration No. 27,075

Kirk D. Berkhimer
Registration No. 59,874

JAO:KDB/mab
Date:  December 21, 2007



**PATENT APPLICATION**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of                                      Attn:    OIPE

Peter Kenneth HELLIER et al.

Application No.:  11/885,545                      Docket No.:    133774

Filed:    September 4, 2007

For:    MEASUREMENT PROBE

## REQUEST FOR CORRECTION OF PALM RECORDS

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

    Attached is a photocopy of the original filing receipt on which errors have been corrected in red.  These errors are being brought to the attention of the Patent and Trademark Office so that it may correct its records.

Respectfully submitted,

James A. Oliff
Registration No. 27,075

Christopher J. Wheeler
Registration No. 60,738

JAO:CJW/dcb

Date:  April 14, 2008

**OLIFF & BERRIDGE, PLC**
**P.O. Box 320850**
**Alexandria, Virginia  22320-4850**
**Telephone:  (703) 836-6400**

| DEPOSIT ACCOUNT USE |
| :---: |
| AUTHORIZATION |
| Please grant any extension |
| necessary for entry; |
| Charge any fee due to our |
| Deposit Account No. 15-0461 |





UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 11/885,545 | 09/04/2007 | 2859 | 900 | 133774 | 13 | 3 |

CONFIRMATION NO. 5922

25944
OLIFF & BERRIDGE, PLC
P.O. BOX 320850
ALEXANDRIA, VA 22320-4850

**FILING RECEIPT**

*OC000000029184027*

Date Mailed: 04/02/2008

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please write to the Office of Initial Patent Examination's Filing Receipt Corrections. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**
　　　Peter Kenneth Hellier, North Nibley, UNITED KINGDOM;
　　　David Roberts McMurtry, Dursley, UNITED KINGDOM;
**Assignment For Published Patent Application**
　　　Renishaw PLC, ~~Wotton-Under-edge,~~ UNITED KINGDOM    *Wotton-under-Edge*
**Power of Attorney:** The patent practitioners associated with Customer Number 25944    *(please correct capitalization)*

**Domestic Priority data as claimed by applicant**
　　　This application is a 371 of PCT/GB06/01095 03/24/2006

**Foreign Applications**
UNITED KINGDOM 0506158.5 03/24/2005

**If Required, Foreign Filing License Granted:** 03/31/2008

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 11/885,545**

**Projected Publication Date:** 07/10/2008

**Non-Publication Request:** No

**Early Publication Request:** No

page 1 of 3

**Title**

      Measurement Probe

**Preliminary Class**

      033

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**<u>GRANTED</u>**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

## NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

# EXHIBIT 10

HEXAGON Ltd
Riverside
Manbre Road
London W6 9WA
UNITED KINGDOM



Via Federal Express

July 11, 2008

James A. Oliff
Oliff & Berridge, PLC
277 South Washington Street
Suite 500
Alexandria, Virginia
USA

> **Conflict of Interest:** *Renishaw plc v. TESA SA and Hexagon Metrology, Inc.,*
> **Case No. 08-cv-3485 (N.D. Ill.)**

Dear Mr. Oliff:

Hexagon was stunned to learn that Oliff & Berridge is representing Renishaw in a patent infringement suit against TESA SA and Hexagon Metrology, Inc. (collectively "Hexagon"). As you know, Oliff & Berridge has represented and currently represents Hexagon companies in patent litigation and patent prosecution matters. In particular, Oliff & Berridge obtained and had access to privileged and confidential information from Hexagon's management and employees that is relevant to issues raised against Hexagon in the present lawsuit.

Oliff & Berridge, for example, represented Hexagon companies in at least two patent infringement litigation matters. Indeed, Oliff & Berridge represented Mitutoyo Corp., Mitutoyo America Corporation and Hexagon Metrology Nordic AB in a patent infringement case entitled *Mitutoyo Corp., Mitutoyo America Corporation and Hexagon Metrology Nordic AB v. Central Purchasing*, Civil Action 03-CV-00990 ("*Mitutoyo* litigation"). We note that at least one Oliff & Berridge attorney, John O'Meara, appeared in both the *Mitutoyo* litigation and the present lawsuit. The *Mitutoyo* litigation settled only a couple months ago around April 7, 2008. Thus, it is apparent that Oliff & Berridge has been simultaneously representing both Renishaw and Hexagon in litigation matters.

Moreover, Oliff & Berridge has prosecuted and continues to prosecute patent applications for Hexagon companies.

As I am sure you can understand, Hexagon is very concerned about the actual conflict of interest presented by these facts. As a current Oliff & Berridge client, Hexagon is also concerned about maintaining a good working relationship with Oliff & Berridge attorneys who represent Hexagon companies in pending patent prosecution matters.

Given the magnitude of the actual conflict, Hexagon expects Oliff & Berridge to promptly withdraw from its representation of Renishaw in the current litigation against Hexagon.



July 11, 2008
Page 2

If Oliff & Berridge does not believe there is a conflict of interest in its continued representation of Renishaw in this lawsuit, I request that Oliff & Berridge provide a response to this letter detailing its reasoning by Thursday, July 17, 2008. If Oliff & Berridge does not withdraw from this case and we do not receive a response to this letter by July 17th, Hexagon reserves the right to seek whatever recourse necessary to protect its interests.

Thank you for your cooperation and prompt attention to this matter.

Sincerely,

Frederick W. London
General Counsel

Copies to      Sir David McMurtry
               John W. O'Meara, Esq.
               Patrick G. Burns, Esq.
               Alan L. Barry, Esq.

# EXHIBIT 11

i

# OLIFF & BERRIDGE, PLC

ATTORNEYS AT LAW

277 SOUTH WASHINGTON STREET
ALEXANDRIA, VIRGINIA 22314

TELEPHONE: (703) 836-6400
FACSIMILE: (703) 836-2787
E-MAIL: EMAIL@OLIFF.COM
WWW.OLIFF.COM

July 14, 2008

Frederick W. London
General Counsel
HEXAGON LTD.
Riverside
Manbre Road
London W6 9WA
UNITED KINGDOM

**By Facsimile**

Re:    Your July 11, 2008 Letter

Dear Mr. London:

We today received and are considering your July 11 letter setting forth your belief that our firm has a conflict of interest in representing Renishaw in the case of *Renishaw plc v. TESA SA and Hexagon Metrology, Inc.*, Case No. 08-cv-3485 (N.D. Ill.).

In order that we may fully consider the issues that you have raised, please specifically identify by return facsimile (1) the "Hexagon companies," second infringement litigation matter, and prosecution matters that are generally referred to but not specifically identified in your letter, and (2) the privileged and confidential information that you indicate was obtained by our firm and is relevant to issues raised against Hexagon in the present lawsuit brought by Renishaw. We will then further respond to your letter as you have requested.

We look forward to hearing from you by return facsimile.

Very truly yours,

James A. Oliff

JAO/scg

cc:    Alan L. Barry, Esq.

# EXHIBIT 12



July 24, 2008

James A. Oliff
Oliff & Berridge, PLC
277 South Washington Street
Alexandria, Virginia 22314

Conflict of Interest: ***Renishaw plc v. TESA SA and Hexagon Metrology, Inc.,***
***Case No. 08-cv-3485 (N.D. Ill.)***

Dear Mr. Oliff:

I received your letter of July 14, 2008 and respond as follows.

I understand that the Northern District of Illinois Rules of Professional
Conduct preclude an attorney from taking a position adverse to a current client:

> A lawyer *shall not* represent a client if the representation of that client
> will be directly adverse to another client, unless: (1) the lawyer
> reasonably believes the representation will not adversely affect the
> relationship with the other client; and (2) each client consents after
> disclosure.  N.D. Ill. Local Rule 83.51.7(a) (emphasis added).

Despite the clear import of this ethical obligation, Oliff & Berridge has
been and is currently representing commonly-controlled Hexagon entities,
including Hexagon Metrology Nordic AB, Leica Geosystems AG, and C.E.
Johansson AB, while simultaneously taking an adverse position against
Hexagon in the above litigation.  Oliff & Berridge neither informed Hexagon of
this conflict nor requested its consent to the adverse representation.  You do not
deny these facts in your letter.  Thus, as mandated by the governing ethical
rules, Oliff & Berridge's concurrent representation requires that you and your
firm immediately withdraw from this litigation.

As your client, Hexagon has *no* obligation to identify the privileged or
confidential information Oliff & Berridge obtained as a result of this ethical
violation.  Indeed, the mere presence of this conflict of interest creates the
*irrebuttable presumption* that your firm possesses such information.

In view of this ongoing ethical violation, Hexagon also requests that
Oliff & Berridge immediately preserve all information and records, including
electronically stored information, related to its current and past representation of
any Hexagon-controlled entity.  Additionally, please send me within three
business days copies of all the firm's billing records, electronic and hard copy
communications, and client files pertaining to these entities.  Hexagon will
reimburse Oliff & Berridge for the reasonable costs associated with providing
these documents.

July 24, 2008
Page 2

    I remain confident that Oliff & Berridge will abide by its ethical obligations. If it does not do so, however, Hexagon will be forced to take appropriate action.

Sincerely,

Frederick W. London
General Counsel

Copy to Alan L. Barry

# EXHIBIT 13

# OLIFF & BERRIDGE, PLC

### ATTORNEYS AT LAW

277 South Washington Street
Alexandria, Virginia 22314

Telephone: (703) 836-6400
Facsimile: (703) 836-2787
E-mail: EMAIL@OLIFF.COM
WWW.OLIFF.COM

July 29, 2008

Frederick W. London
General Counsel
HEXAGON LTD.
Riverside
Manbre Road
London W6 9WA
UNITED KINGDOM

**By E-mail**

Re:     Your July 11 and 24, 2008 Letters

Dear Mr. London:

Thank you for your July 11 and 24 letters, the latter of which we received on the afternoon of July 25 with Mr. Webb's e-mail communication of that date. After thoroughly and objectively considering the points that you have raised, we do not believe that there is a conflict of interest in our firm's representation of Renishaw, whom we have openly and publicly represented since prior to the inception of our firm in 1983, in the current lawsuit of *Renishaw plc v. TESA SA and Hexagon Metrology, Inc.*, Case No. 08-cv-3485 (N.D. Ill.).

The related litigation matters for Mitutoyo, one of which is identified in your July 11 letter, commenced in July 1999, prior to the origin of the Hexagon Metrology group, and concluded in April of this year. In those litigation matters, we represented our long-standing client Mitutoyo, a manufacturer of digital calipers and the exclusive licensee under U.S. Patent No. 4,743,902 relating thereto. Under U.S. law with respect to patent infringement cases, we were required to name C. E. Johansson AB as a co-party with Mitutoyo given that Johansson owned the 902 Patent. When Hexagon Metrology Nordic AB later acquired the 902 Patent, Hexagon Nordic became a co-party with our client Mitutoyo. The Mitutoyo litigation matters did not involve the same parties, patents, or technology that are at issue in the current lawsuit. Moreover, Johansson and Hexagon Nordic had their own outside counsel for monitoring the litigations and communicating with us.

Our U.S. prosecution work for the Liechtenstein law firm of Buchel, Kaminski & Partner on behalf of its client, Leica Geosystems AG, commenced in 1999, many years before Leica was acquired by Hexagon AB of Sweden. That prosecution work has not involved the technology at issue in the current lawsuit, and our communications with respect to that prosecution work have been with the Buchel firm.

# OLIFF & BERRIDGE, PLC

**ATTORNEYS AT LAW**

Frederick W. London
July 29, 2008
Page 2

No privileged or confidential information that we may have obtained from C. E. Johansson, Hexagon Nordic, or Leica Geosystems would have any relevance to the issues raised in the current lawsuit. Indeed, as noted above, the litigations on behalf of Mitutoyo, and the prosecution work for Buchel, Kaminski on behalf of Leica, have involved different technologies than are involved in the current lawsuit.

In handling the now-concluded litigation matters for Mitutoyo with C. E. Johansson or Hexagon Nordic as a co-party, and in handling U.S. prosecution for Buchel, Kaminski on behalf of Leica, our firm did/does not thereby also represent affiliated companies. Our firm is therefore not barred from representing Renishaw in the current lawsuit adverse to affiliated companies, particularly given that the subject matter of the current lawsuit is unrelated to the work that we have performed in the litigations for Mitutoyo and in the Buchel, Kaminski prosecution work for Leica. As indicated in American Bar Association Comment [34] to Model Rule 1.7:

> [34] A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. See Rule 1.13(a). Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate in an unrelated matter, unless the circumstances are such that the affiliate should also be considered a client of the lawyer, there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates, or the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client.

Thus, we respectfully submit that the circumstances that you mention do not create a conflict vis-à-vis our representation of Renishaw in the current lawsuit. Accordingly, following serious consideration, we plan to continue that representation. While we believe that such representation can occur simultaneously with our handling of the Buchel, Kaminski prosecution work for Leica, we will, of course, transfer that prosecution work to another firm of your and Buchel's choice if you prefer. Also, although not possible within your requested three (3) business days, we will provide you, through Buchel, with copies of those prosecution files if you continue to see benefit in our doing so.[*]

---

[*] We cannot provide you with complete copies of our Mitutoyo litigation files because, as you know, those files include information proprietary to Mitutoyo, a competitor of Hexagon Metrology. However, we can provide you with copies of the publicly available litigation records if you wish. Please note that, because of the large volume of such files, copying them would be very time-consuming and expensive.

## OLIFF & BERRIDGE, PLC
### ATTORNEYS AT LAW

Frederick W. London
July 29, 2008
Page 3

Our firm takes its ethical obligations seriously, and has endeavored to objectively evaluate your expressed concerns.  We trust that, in view of the explanation provided above, you will agree that our representation of Renishaw in the current lawsuit results in no conflict of interest.  We would be pleased to meet with you and your counsel to discuss the matter in an effort to alleviate any remaining concerns that you may have.

Very truly yours,

James A. Oliff

JAO/scg

cc:     Alan L. Barry, Esq.