**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RENISHAW PLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08-CV-3485 |
| v. ) | |
| ) | Hon. Rebecca R. Pallmeyer |
| TESA SA, and ) | Presiding Judge |
| HEXAGON METROLOGY, INC. (also dba) | |
| TESA USA, BROWN & SHARPE, INC. and) | Hon. Judge Nan R. Nolan |
| SHEFFIELD MEASUREMENT, INC.) ) | Magistrate Judge |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANTS' REPLY IN
SUPPORT OF THEIR MOTION TO DISQUALIFY
<u>OLIFF & BERRIDGE FROM ITS REPRESENTATION OF RENISHAW PLC</u>**

**I.    PRELIMINARY STATEMENT**

Oliff & Berridge's contention that no conflict exists ignores both the undisputed facts and

settled law.  It first argues that the Hexagon Group entities share no unity of interest.  But Oliff

offers no evidence disputing that the Hexagon Group—at both the parent and subsidiary level—

has integrated its business, managerial, legal, financial, R&D and marketing functions.  Indeed, it

would be hard to imagine a more unified corporate structure.  Oliff fails to reconcile its assertion

that, when weighing irreparable harm, the Hexagon Group controls its subsidiaries' marketing,

sales and business strategies, yet, when weighing Oliff's own ethical behavior, these same

entities independently manage their business and legal affairs.  In addition, Oliff argues that its

concurrent representations are unrelated and that it possesses no confidential information

relevant to this case.  However, under this Court's ethical rules, these factors are immaterial.

The duty of loyalty applies even if no overlapping issues or shared confidences exist.  And,

unlike Oliff, the ethical rules make no value judgment on the importance of the conflicting representations: the duty of loyalty applies to all clients, not just those with whom the lawyer has the oldest, most-lucrative relationships. Likewise, the law categorically rejects any notion that Hexagon and its related companies should have known (*i.e.*, guessed) that Oliff would side with Renishaw against Hexagon. Oliff, not Hexagon, had the burden of confronting and resolving its ethical issues.

At bottom, the unity of interest test, coupled with Renishaw's admissions regarding Hexagon's integrated business operations, demonstrates Oliff is now representing both parties to this action. The "hot potato" rule precludes Oliff from dropping Leica Geosystems as a client, and the proposed "ethical screen" would fail to address the threat of divided loyalty. Disqualification, therefore, is the only appropriate remedy.

## II.     ARGUMENT

### A.     The Hexagon Group Shares a Unity of Interest

As discussed in Hexagon's opening brief, when corporate affiliates share a sufficient "unity of interest," they qualify as the same client for conflict of interest purposes. *See, e.g., Certain Underwriters v. Argonaut Ins.*, 264 F. Supp. 2d 914, 920-21 (N.D. Cal. 2003). Relevant factors for establishing this unity of interest include shared management, legal departments, finances, and business philosophies. *See, e.g., id.* at 922-24; *Ramada Franchise Sys. v. Hotel of Gainesville Ass'n*, 988 F. Supp. 1460, 1465 (N.D. Ga. 1997). In other words, courts consider whether the affiliates "view each other as strangers . . . [or] more like members of the [Hexagon] family." *See Discotrade, Ltd. v. Wyeth-Ayerst Int'l*, 200 F. Supp. 2d 355, 359 (S.D.N.Y. 2002).

Here, the Hexagon Group shares this unity of interest. The Group's centralized management, led by President and CEO Ola Rollén, oversees all of the affiliated companies'

operations, including their business, financial, marketing, research and development, and legal strategies. (*See* Pettersson Decl., Ex. 1 at ¶ 4.)[1]  Unlike *Reuben H. Donnelley, Corp. v. Sprint Publishing & Advertising, Inc.*, 1996 U.S. Dist. LEXIS 2363 (N.D. Ill Feb. 28, 1996), where each corporate affiliate had a large board of directors with limited overlap, only a handful of Hexagon employees run the Group's global operations.

For example, Ola Rollén, Håkan Halén, Hexagon's CFO, and Gert Viebke, Hexagon's Vice President of Strategy, compose the "Group Management" for the entire Hexagon Group. (Pettersson Decl. ¶ 3.)  Mr. Rollén and Mr. Halén also sit on Hexagon Metrology, Inc.'s ("HMI") three-person Board of Directors, which includes William Gruber, HMI's President.  (*Id.* at ¶ 13.) Not only does Mr. Gruber oversee the Group's North American operations, but he is also a director for Leica Geosystems USA.  (*Id.* at ¶ 12.)  In addition to Mr. Gruber, Walter Schwyter and Norbert Hanke make up the three-person Board of Directors for Leica Geosystems, Inc. USA.  (Webb Decl., Ex. 14 at ¶ 2.)  Mr. Schwyter, Klaus Brammertz, and Mr. Rollén (who is also Leica Geosystems' CEO and Chairman), form Leica Geosystems' Board of Directors.  (*See id. at ¶* 3; Ex. 15.)  Similarly, Messrs. Halén and Viebke of Group Management solely comprise C.E. Johansson's Board of Directors.[2]  (*See* Ex. 4 to Opp.)  Thus, when considered in the appropriate context, this substantial overlap in management further demonstrates the Group's unity of interests.

Oliff admits the Group's common control and ownership, but argues that this factor alone is not dispositive.  (Opp. 2.)  Attempting to downplay the admissions in Renishaw's preliminary

---

[1]  Defendants' Exhibits 1-13 were attached to their Memorandum In Support of Their Motion to Disqualify Oliff & Berridge from Its Representation of Renishaw.  Exhibits 14-19 are attached to this Reply.

[2]  C.E. Johansson was renamed "Hexagon Metrology Nordic AB" in 2005.

injunction motion that the Group controls its affiliate entities, Oliff misinterprets *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264 (D. Del. 1980), and *Ramada*, 988 F. Supp. 1460, suggesting the Group's common control and ownership are "a very different issue from whether the operations of the various Hexagon companies are completely integrated for conflict purposes." (Opp. 2.) The *Pennwalt* and *Ramada* courts, however, simply recognized that corporate affiliation alone was not sufficient to warrant disqualification. Instead, they recommended a "pragmatic approach" in considering the relationship between the affiliates. *See Ramada*, 988 F. Supp. at 1464-65; *Pennwalt*, 85 F.R.D. at 269 ("The chosen mode of analysis is to carefully sift 'all of the facts and circumstances,' and weigh the same against the specific goals and objectives of the Canons.") (citation omitted). This is the same analysis that Hexagon has applied and the same analysis that warrants Oliff's disqualification.

Oliff's efforts to avoid disqualification by characterizing this conflict as involving sister corporations are similarly unavailing for a host of reasons. First, Oliff's and Renishaw's own admissions undisputedly implicate the Hexagon Group in the underlying action. As Hexagon described in its opening brief, Renishaw's irreparable harm argument ***centers*** on the Hexagon Group's acquisition of Renishaw's customers, including HMI. Second, when Renishaw's Chief Patent counsel, Tim Jackson, contacted Hexagon about the '005 Patent involved in this litigation, he approached Bo Pettersson, the Group's Chief Technology Officer—***not*** HMI or TESA's company-level managers. Third, when Renishaw identified "representatives and employees of Hexagon . . . hav[ing] knowledge about Renishaw's notification to Hexagon of the 005 Patent," it listed Mr. Pettersson, Dr. Harmann, and Giovanni Gervasio—each of whom works for or on behalf of the Hexagon Group. (*See* Ex. 3 at 8.) Fourth, when Renishaw requested documents from Hexagon, it identified

4

> [d]ocuments, including sales and distribution agreements and price lists, sufficient to demonstrate the business terms by which the TESASTAR-mp and TESASTAR-pr products are sold, distributed or consigned (a) *by or to Hexagon Metrology, Inc.'s parents, subsidiaries, affiliates, or related entities*, including without limitation Tesa SA, Tesa USA, Brown & Sharpe, Inc., Sheffield Measurement, Inc., and *Hexagon AB*.

(Ex. 16 at 7 (emphasis added).)  Fifth, when Renishaw defined "Hexagon," it did not limit the term to HMI and TESA, but broadly included "Hexagon AB and its Hexagon Metrology [G]roup."  (*See, e.g.,* Somerville Decl., Dkt. 12, ¶ 35 & n.2.)  Finally, outside of the litigation context, Renishaw likewise (and tellingly) views the various Hexagon affiliated companies as a unified entity.  For example, Renishaw's June 2008 CMM Division Report tracks probe sales to the "Hexagon Group" collectively, not to the operating companies individually.  (Ex.17; Somerville Rough Dep., Aug. 15, 2008, 189-90, 194-95, Ex. 18 (filed under seal pursuant to the Protective Order entered in this case).)

In sum, Oliff's attempts to justify its current, adverse representation irreconcilably contradict the positions Renishaw has taken in both this case and its normal business operations; Oliff cannot now distance the Hexagon Group from HMI and TESA to avoid disqualification while simultaneously implicating the Group and its products in this suit.

Even if the present motion were limited to the Hexagon Group's sister corporations, Oliff fails to explain why that distinction would eliminate its ethical problems.[3]  To the contrary, courts have disqualified law firms based on their representation of co-subsidiaries.  *See Discotrade*, 200 F. Supp. 2d 353; *J.P. Morgan Chase Bank v. Liberty Mutual Ins.*, 189 F. Supp. 2d 20 (S.D.N.Y. 2002);  *Travelers Indemnity Co. v. Gerling Global Reinsurance Corp.*, 2000

---

[3] After accusing Hexagon of "out-of-context plucking of snippets of language from . . . cases," (Opp. 8), and asserting that only cases involving sister corporations are relevant (*id.*), Oliff inexplicably fails to distinguish *Ramada*, 988 F. Supp. 1460, cited by Hexagon in its opening brief, which found that sister corporations were the same client for conflict of interest purposes.  *Id.* at 1465.

U.S. Dist. LEXIS 11639 (S.D.N.Y. Aug. 14, 2000); *Cincinnati Bell, Inc. v. Anixter Bros., Inc.*, 1994 U.S. Dist. LEXIS 21012 (S.D. Ohio June 24, 1994).   As the *Cincinnati Bell* court recognized, "We cannot imagine how an attorney can maintain a duty of undivided loyalty to a client, while at the same time zealously attempting to exact millions of dollars of damages from a sister corporation."  1994 U.S. Dist. LEXIS 21012, at *9.

Even *Pennwalt*, which Oliff heavily relies on to justify its current representation of Renishaw, supports disqualification.   *Pennwalt*, 85 F.R.D. 264.   In *Pennwalt*, the conflict involved a law firm's representation of the plaintiff in litigation against its client's sister corporation.   The acquisition creating this corporate affiliation occurred one month before the lawsuit was filed and was still "ongoing" when the defendant moved for disqualification.  *Id.* at 266, 272.   Because the two affiliates were not yet fully assimilated, the court found that no conflict existed.  *Id.* at 272.   The court emphasized, however, that a conflict was "***certain to arise in the future*** by virtue of the evolving assimilation" of the affiliates.  *Id.* (emphasis added). Specifically, once the merger was complete, the CEO would be "sitting on both boards of directors" and "headquarters would be consolidat[ed] with the personnel of one legal department under . . . the active supervision of the same attorney."  *Id.*  Here, the conflict once "certain to arise in the future," has now occurred.  *Id.*  Contrary to Oliff's suggestion that the relevant acquisitions occurred "fairly recently" (Opp. 1), Hexagon acquired Brown & Sharpe (now HMI) in 2001, C.E. Johansson in 2002, and Leica Geosystems in 2005.   These entities are now fully integrated into the Hexagon Group.

### B.     Oliff Applies the Incorrect Standard for Disqualification

Because the Hexagon Group qualifies as Oliff's client under the "unity of interest" test, its representation of Renishaw in this matter is adverse to Hexagon.   Thus, the ethical rules

governing concurrent representations apply. *See* N.D. Ill. L.R. 83.51.7. Under these circumstances, the disqualification inquiry addresses "not confidential information or other practical litigation advantage obtained against an affiliate, but the 'duty of undivided loyalty' owed to the affiliate." *Certain Underwriters*, 264 F. Supp. 2d at 922. Based on this duty,

> [a]ll the responsibilities and decisions entrusted to the attorney . . . cannot and must not be influenced in even the slightest measure by consideration of the attorney's future relations with his client's adversary. Conscious calculation by the attorney is not alone prohibited; the ***very threat of divided loyalty*** is a basis for disqualification . . . .

*Pennwalt*, 85 F.R.D. at 271 (emphasis added).

Oliff, however, implies that the more lenient "substantial relationship" test—traditionally reserved for former client conflicts—should govern because the conflict involves corporate affiliates. But courts have expressly rejected that test where, as here, the corporate affiliates qualify as a single client. *See, e.g., Discotrade*, 200 F. Supp. 2d at 360 ("This 'substantial relationship' test . . . has been expressly rejected with respect to conflicts among current clients, and we decline to entertain it here."); *JP Morgan*, 189 F. Supp. 2d at 23 (applying the "doctrine of concurrent representation" instead of the "lesser standards of disqualification").

Even *Pennwalt*, misinterpreted by Oliff as supporting the application of the "substantial relationship" test for conflicts involving sister corporations, emphasized that more stringent ethical standards apply when the adverse representation involves current clients: "The underlying loyalty standard of Canon 5 as applied in concurrent dual representation cases is a higher standard than the 'substantially related' test of Canon 4, ***which has been restricted to prior representation cases***." *Pennwalt*, 85 F.R.D. at 272 (emphasis added).

Thus, Oliff's repeated arguments that its representations of Leica Geosystems and C.E. Johansson have "nothing to do with the technology or issues involved in the instant case" (Opp. 6), and did not result in the firm obtaining any relevant confidential information (*id.*) are

immaterial for Local Rule 83.51.7 conflicts.  Nor does Hexagon bear the burden "to demonstrate that O&B obtained any confidential information that could even possibly be used to Renishaw's advantage and Defendants' detriment."[4]  (Opp. 14.)  Oliff's duty of undivided loyalty to its current clients even preclude the firm from undertaking adverse *unrelated* representations.[5]  Consequently, the critical inquiry is not whether Oliff obtained relevant, confidential information, but rather whether its representation of Renishaw threatens its duty of undivided loyalty.  *See Certain Underwriters*, 264 F. Supp. 2d at 922.   Because of Oliff's current representation of Renishaw against the Hexagon Group, this threat of divided loyalty has manifested itself.

### C.    Oliff Breached Its Duty of Undivided Loyalty to Its Clients

#### 1.    Oliff's Representation of Renishaw Is Adverse to Leica Geosystems

Despite its attempts to diminish the significance of the representation, Oliff does not deny that Leica Geosystems has been a client since 1999.  (Opp. 5.)  Oliff admits corresponding with Dr. Harmann and his firm regarding "payment of government fees, amendments to the patent claims, the citation of prior art, and responses to Office Actions from the U.S. Patent and Trademark Office." (Opp. 6.)  As Oliff also must admit, each of these services is critical to

---

[4]    Even under the more lenient former client test, the client has no obligation to identify any confidential information the firm obtained during its representation.  *See Safe-T-Prods., Inc. v. Extra Measures, Inc.*, 2002 U.S. Dist. LEXIS 20540, at *11-12 (N.D. Ill Oct. 23, 2002) ("The substantial relationship standard does not require that a party moving to disqualify another party's attorney point to or reveal a particular piece of confidential information which the challenged attorney actually received; its receipt will be presumed in circumstances which make it a likely possibility.").

[5]    *See, e.g., Mustang Enter., Inc. v. Plug-In Storage Sys.*, 874 F. Supp. 881, 886 (N.D. Ill. 1995) ("[T]he prohibition against such simultaneous representation even in *unrelated* matters is based on the fundamental concept that lawyers owe undivided loyalties to their client.").

obtaining a patent.[6]   Although Oliff flatly denies receiving "any confidential information regarding overall business, legal, or patent strategies" (Opp. 6), it never explains why a firm's duty of undivided loyalty extends to clients paying for patent litigation (Renishaw), but not patent prosecution (Hexagon).  To the contrary, representing a client before the PTO establishes an attorney-client relationship and, consequently, all its accompanying ethical obligations.  *See Mindscape, Inc. v. Media Depot, Inc.*, 973 F. Supp. 1130, 1133 (N.D. Cal. 1997) ("The fact that [firm] was granted power of attorney to protect the interests of [plaintiff's] patent constitutes an ongoing relationship that bars [firm] from simultaneously representing [defendant] in litigation with [plaintiff].").

Moreover, according to Oliff and Renishaw, Dr. Harmann possesses information related to Hexagon's knowledge of the '005 Patent.  (Ex. 3 at 8.)  This alleged information may be relevant to several key issues in the underlying litigation, including notice, damages, and willfulness.  Oliff tellingly does not deny that Dr. Harmann has material information or that it intends to depose him.  By implicating Dr. Harmann, Oliff has created the distinct possibility that the Hexagon Group's outside patent attorney "will be simultaneously cooperating with [Oliff] in the [Leica Geosystems representation] and opposing [Oliff] in [this] action."  *See United States v. Nabisco*, 1987 U.S. Dist. LEXIS 16795, at *18 (E.D.N.Y. July 10, 1987).  Such a division of loyalties alone warrants Oliff's disqualification.  *See id.*[7]

---

[6]   For example, a response to an office action typically involves both legal and technical arguments by a patent lawyer or agent concerning the patentability of the proposed patent claim.   Such responses often play a key role in claim construction, infringement, and inequitable conduct analyses.

[7]   Oliff's simultaneous cooperation with and adversity to Dr. Harmann further distinguishes the instant conflict from the one at issue in *Donnelly*, where the two representations "offer[ed] no danger of overlap."  *See Donnelley,* 1996 U.S. Dist. LEXIS 2363, at *11-12.

### 2.     Oliff's Representation of Renishaw Is Adverse to C.E. Johansson

Oliff's current representation of Rensihaw also conflicts with its representation of C.E. Johansson in the *Mitutoyo* Litigation.  Both James Oliff and John O'Meara, who have appeared on behalf of Renishaw here, represented C.E. Johansson as recently as April 2008.  During this same time, Renishaw was performing its pre-filing investigation for this case.[8]  Based on Oliff's assertion that it "has represented Renishaw for over 25 years in both litigation and prosecution, [and] . . . is intimately familiar with Renishaw's products and business, [and] . . . has devoted over 1500 hours to date in preparing, filing, and proceeding with this case" (Opp. 13), the firm very likely assisted Renishaw during this investigation.  Indeed, Oliff never denies its involvement.  Rather, it ambiguously states that "the last Mitutoyo litigation concluded in April 2008, before Defendants' products were obtained and the Complaint was filed."  (Opp. 5.)  Any involvement in the pre-filing investigation would be adverse to the Hexagon Group and thus grounds for disqualification.[9]

Oliff also asserts that it has had no contact with certain Hexagon employees and representatives related to the C.E. Johansson representation, such as William Gruber, the current President of HMI and former CEO of Brown & Sharpe, Inc.  (Opp. 5; Oliff Decl. ¶ 19; Short Decl. ¶ 12.)  The actual facts, however, prove otherwise.

On October 16, 2003, for example, Oliff attorney, Darle Short sent a letter to Mr. Gruber referencing the *Mitutoyo* Litigation.  (Ex. 19 (filed under seal).)  He informed Mr. Gruber that "Mr. Nils Edlund of C.E. Johansson requests that we contact you with regard to this litigation, and that we apparently direct all future communications to C.E. Johansson to you (or your

---

[8]     Renishaw admits beginning its infringement investigation by at least December 2007.  (*See* Somerville Decl., Dkt. 12,  ¶ 38.)

[9]     *See Stratagem Dev. Corp. v. Heron Int'l N.V.*, 756 F. Supp. 789, 793 (S.D.N.Y. 1991).

designee) with regard to this matter." (*Id.*)   Most telling, Mr. Short marked the letter "Confidential; Attorney-Client Privileged; Attorney Work Product Communication." (*Id.*)  This letter and Mr. Short's acknowledgement that Mr. Gruber, then CEO of Brown & Sharpe, would be handling the *Mitutoyo* Litigation for C.E. Johansson not only undermine Oliff's repeated contention that HMI and the Hexagon Group have an insufficient relationship with either C.E. Johansson or Oliff to justify disqualification, but also manifest Oliff's concurrent, adverse representations.

> **3.     Oliff Admits That Its Representation of Leica Geosystems Has Threatened Its  Duty of Loyalty to the Hexagon Group**

Despite repeatedly claiming that its representations of C.E. Johansson and Leica Geosystems are unrelated to this case, Oliff unwittingly admits that these representations have indeed threatened its duty of undivided loyalty.  According to Oliff, seeking "CEJ's or Leica's (or their parent's) consent . . . to file the instant case on behalf of Renishaw . . . very likely would have resulted in some preemptive action (e.g., declaratory judgment action) by Defendants against Renishaw."  (Opp. 6-7.)[10]  Regardless of whether Oliff actually made this calculated decision to conceal information from its clients, by recognizing and exposing these conflicting interests, Oliff illustrates how its representation of Renishaw has threatened the firm's duty of undivided loyalty to C.E. Johansson, Leica Geosystems, and the Hexagon Group.

> **D.     Oliff's "Knew or Should Have Known" Waiver Standard Is Legally Untenable and Contradicts Its Ethical Obligations**

Under this Court's Rules of Professional Conduct, Oliff was obligated to first seek a waiver from the Hexagon Group before representing Renishaw here.  *See* N.D. Ill. L.R. 83.57.1.

---

[10]   This admission is particularly difficult to harmonize with Oliff's repeated averment that this infringement suit "will not have a <u>direct</u> adverse effect on [Lecia or C.E. Johansson's] parent or sister companies."  (Opp. 14.)

Oliff admits that it never even informed either C.E. Johansson, Leica Geosystems, or the Group of the potential conflict. Instead, the firm argues that its clients should have recognized the possibility that Oliff would represent Renishaw against the Group. According to Oliff, "CEJ and Leica (and their parent) knew, or had every reason to know, for years that O&B represents Renishaw in both prosecution and litigation. In particular, they knew or had every reason to know, that O&B would represent Renishaw in any litigation against affiliates of CEJ and Leica." (Opp. 6.) Consequently, in Oliff's opinion, it "was not obligated to obtain CEJ's or Leica's (or their parent's) consent" to represent Renishaw in this matter. (*Id.*)

Yet, Oliff offers no legal support for its "knew or had every reason to know" consent standard. In fact, the Seventh Circuit rejected this precise argument in *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978). In *Westinghouse*, Kirkland & Ellis represented "a nation-wide trade association composed with 350 corporate and 7,500 individual members." *Id.* at 1318-19. It later represented Westinghouse in litigation against individual oil companies who were members of the association. Not persuaded by the same implicit waiver argument Oliff now presents, the court of appeals emphasized: "The point, however, is not that the oil companies were aware that Kirkland represented Westinghouse but whether the oil companies were aware that such representation would lead to Kirkland representing Westinghouse in a lawsuit in which the oil companies would be defendants." *Id.* Thus, it is "[the firm's] duty to keep the [clients] advised of actual or potential conflicts of interest, ***not the [clients'] to divine those conflicts***." *Id.* at 1321 (emphasis added).[11]

---

[11]    *See also Cincinnati Bell*, 1994 U.S. Dist. LEXIS 21012, at *11-12 (because full disclosure to clients "is an explicit prerequisite to the consent under the [current representation] rule," law firm's "knew or should have known" argument "based on constructive knowledge and implicit consent [was] unpersuasive").

### E.    Equitable Balancing Weighs In Favor Of Disqualification

After finding a conflict, courts further consider whether disqualification is the appropriate remedy, but they undertake this analysis in light of the "language and purpose" of the relevant ethical rule. *See Alex Munoz Gen. Contractor, Inc. v. MC3d, Inc.*, 1998 U.S. Dist. LEXIS 18728, at *5-6 (N.D. Ill. Nov. 24, 1998). Where, as here, the conflict involves a current, adverse and unwaived representation—in direct violation of Local Rule 83.51.7—the equitable considerations Oliff is promoting should bear little or no weight. *See Andrew Corp. v. Beverly Mfg.*, 415 F. Supp. 2d 919, 925 (N.D. Ill. 2006) ("[The] unwaived conflict created by [the firm's] concurrent representation of two clients with adverse interests ***eliminates*** any opportunity to fashion a less restrictive remedy.") (emphasis added). Even when the conflict involves affiliate corporations, courts have disqualified counsel without balancing the parties' respective interests.[12] Should the Court apply an equitable balancing approach, however, the factors weigh in favor of Oliff's disqualification.

First, disqualification will not unduly prejudice Renishaw. Hexagon filed this motion before answering the Complaint, thus putting Renishaw on notice at an early stage that it may ultimately need to obtain alternative counsel. *See Ransburg Corp. v. Champion Spark Plug Co.*, 648 F. Supp. 1040, 1047 (N.D. Ill. 1986); *JP Morgan,* 189 F. Supp. at 23 (where disqualification occurs "near the very outset of the litigation . . . the prejudice to plaintiff in having to substitute new counsel is relatively modest"). Renishaw's theory of patent infringement is detailed in the declaration and claim charts of its technical expert. (*See* Dkt. 12.) The preliminary injunction

---

[12]    *See, e.g., Jones v. Rabanco, Ltd.*, 2006 U.S. Dist. LEXIS 53766 (W.D. Wash. Aug. 3, 2006); *JP Morgan*, 189 F. Supp. 2d 20; *Travelers*, 2000 U.S. Dist. LEXIS 11639; *Cincinnati Bell*, 1994 U.S. Dist. LEXIS 21012; *Baxter Diagnostics Inc. v. AVL Scientific Corp.*, 798 F. Supp. 612 (C.D. Cal. 1992).

hearing is almost three months away and Oliff has yet to take any depositions.[13]   Renishaw's

local counsel, Greer, Burns, & Crain, also have been involved with this suit since its

commencement and are eminently capable of assuming a lead role in the litigation.  Lastly, Oliff,

not Hexagon, created the current conflict of interest, and, as a result, Oliff, not Hexagon, should

adhere to its duty of undivided loyalty.[14]   Indeed, as Judge Holderman recognized, "the

disqualification may work a hardship on [the plaintiff], but it cannot be said that this hardship

outweighs the Court's duty to enforce the ethical obligations of the profession." *Ransburg*, 648

F. Supp. at 1047.

### F.    Disqualification Is the Only Available Remedy

Oliff's alternatives to disqualification similarly lack legal support.  Oliff first suggests

that dropping Leica Geosystems as a client would somehow ameliorate its ethical breaches.  To

the contrary, this approach "would allow such unethical behavior to continue unrestricted

because a law firm could always convert a present client to a former client merely by seeking to

withdraw after suing a present client." *Ransburg*, 648 F. Supp. at 1044; *see also Alex Munoz*,

1998 U.S. Dist. LEXIS 18728, at *8 (firm cannot drop a client "like a 'hot potato' merely

because it wishes to represent a more lucrative client against a less lucrative one").

Nor do the cases Oliff cites support a law firm's ability to effectively ignore the interests

of a current client in favor of a more profitable representation.  In *Gould*, for example, the

---

[13]    In any event, the entire premise for expediting this case—Renishaw's claim of immediate
irreparable harm—was false.  Despite repeated chances to do so at his recent deposition, the
President of Renishaw's US subsidiary, Leo Somerville, could not identify any actual
irreparable harm Renishaw is suffering from Hexagon's alleged conduct.   (Somerville
Rough Dep. 183-86, Ex. 18.)

[14]    *See Ransburg*, 648 F. Supp. at 1047 ("One's sympathy for [the] William [firm] is tempered
by the knowledge that this is a problem of their own creation and one which could easily
have been avoided.").

corporate acquisition creating the conflict occurred during the middle of the litigation. *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1126-27 (N.D. Ohio 1990). Thus, unlike this case where the Hexagon Group acquired HMI, TESA, C.E. Johansson, and Leica Geosystems years before Oliff voluntarily undertook this current representation, the law firm in *Gould* had no opportunity to avoid the conflict. Indeed, *Pennwalt*, which Oliff cites for this very proposition, expressly denounced a withdrawal under these circumstances:

> The Court does not suggest that counsel may eliminate an existing conflict merely by choosing to represent the more favored client and withdrawing its representation of the other. Such conduct is expressly disfavored.

*Id.* at 272. Yet, this is precisely the option Oliff is offering.

Because the conflict involves the firm's simultaneous representation of adverse clients, "screening" is also inappropriate. Oliff surprisingly relies on this Court's decision in *Safe-T-Prods.*, 2002 U.S. Dist. LEXIS 20540, as support for an "institutional mechanism" separating the attorneys working on the Renishaw matter from those prosecuting Leica Geosystems' patent applications. (Opp. 14.) As Oliff correctly admits, however, the "circumstances [in *Safe-T-Products*] are not involved in the instant case." (Opp. 8 n.3.) *Safe-T-Products* addressed a prior representation where an attorney's move to a new law firm created the firm's conflict. Where, as here, the firm—not the lawyer—switches sides, the screening alternative to disqualification is not available. *See Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983); *Westinghouse*, 580 F.2d at 1321.

## III.    CONCLUSION

Accordingly, Defendants request the Court grant this Motion and disqualify Oliff & Berridge.

Dated:  August 25, 2008                    Respectfully submitted,

                                           DEFENDANTS

                                           By: */s/ Michael J. Abernathy*
                                                One of their Attorneys

                                           Michael J. Abernathy (mabernathy@bellboyd.com)
                                           Alan L. Barry (abarry@bellboyd.com)
                                           Patricia Kane Schmidt (pschmidt@bellboyd.com)
                                           Jason A. Engel (jengel@bellboyd.com)
                                           Marron A. Mahoney (mmahoney@bellboyd.com)
                                           BELL, BOYD & LLOYD LLP
                                           70 West Madison Street, Suite 3100
                                           Chicago, Illinois  60602
                                           (312) 372-1121
                                           (312) 827-8000 (fax)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that true and correct copies of the foregoing DEFENDANTS'
REPLY IN SUPPORT OF THEIR MOTION TO DISQUALIFY OLIFF & BERRIDGE FROM
ITS REPRESENTATION OF RENISHAW PLC were served in the manner indicated below:

**Via ECF with courtesy copy via email:**

Patrick G. Burns
B. Joe Kim
Greer, Burns & Crain, Ltd.
300 South Wacker Drive
25th Floor
Chicago, IL 60606

**Via ECF with courtesy copy via email:**

John W. O'Meara (jomeara@oliff.com)
Aaron L. Webb (awebb@oliff.com)
Edward P Walker (ewalker@oliff.com)
John A. Radi (jradi@oliff.com)
Oliff & Berridge, PLC
277 South Washington Street
Suite 500
Alexandria, VA 22314

on this 25th day of August, 2008.

*/s/ Patricia Kane Schmidt*
One of the Attorneys for
DEFENDANTS

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RENISHAW PLC, <br><br> Plaintiff, <br><br> v. <br><br> TESA SA, and <br> HEXAGON METROLOGY, INC. (also dba) <br> TESA USA, BROWN & SHARPE, INC. and) <br> SHEFFIELD MEASUREMENT, INC.) <br><br> Defendants. | No. 08-CV-3485 <br><br> Hon. Rebecca R. Pallmeyer <br> Presiding Judge <br><br> Hon. Nan R. Nolan <br> Magistrate Judge |

**DECLARATION OF COLLIN A. WEBB IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISQUALIFY OLIFF & BERRIDGE**

NOW COMES Collin A. Webb who declares that:

1.     My name is Collin A. Webb and I am Hexagon Metrology Group's Assistant General Counsel.  I am a citizen of the United States of America and an employee of Leica Geosystems, Inc. USA ("Leica Geosystems USA").

2.     William Gruber, Walter Schwyter and Norbert Hanke make up the three-person board of directors for Leica Geosystems USA.

3.     Mr. Schwyter, Klaus Brammertz, and Ola Rollén (who is also Leica Geosystems AG's CEO and Chairman), form the Board of Directors of Leica Geosystems AG.

Under penalty of perjury, I swear that the foregoing is true and correct.

Dated: 25 August 2008

_____
Collin A. Webb

987776/D/1

# EXHIBIT 15

Case 1:08-cv-03485    Document 48-3    Filed 08/25/2008    Page 2 of 2

- when it h

Home  |  Countries  |  Deutsch  |  Contact  |  Search  |  Print

**Solutions**    **Products**    **Support - Service**    **About us**    **Contact**

**About us**

--→ Our Company
  ↓ Our Mission and Values
  ↓ Breadth
  ↓ Sustainability
  ↓ Quality
  ↓ History
  ↓ Technology
  --→ **Board of Directors**
  ↓ Management Team
↓ Careers
↓ News
↓ References
↓ Customer Magazine
↓ Partnerships
↓ Imprint

Leica Geosystems --→ About us --→ Our Company --→ Board of Directors

## Board of Directors
Leica Geosystems AG



**Ola Rollén**
Chairman of the Board



**Walter Schwyter**
Vice Chairman of the Board



**Klaus Brammertz**
Member of the Board

Legal Information    Sitemap    © Leica Geosystems 2008 - Part of Hexagon Group

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RENISHAW PLC,                          )
                                       )
                Plaintiff,             )      Case No. 1:08-cv-03485
                                       )
        v.                             )
                                       )
TESA SA, and                           )
HEXAGON METROLOGY, INC. (also dba      )
TESA USA, BROWN & SHARPE, INC.,        )
and SHEFFIELD MEASUREMENT, INC.),      )
                                       )
                Defendants.            )
                                       )
_____)

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Renishaw

plc ("Renishaw") requests that the Defendants Hexagon Metrology, Inc. (also doing business as

Tesa USA, Brown & Sharpe, Inc., and Sheffield Measurement, Inc.), and Tesa, SA (collectively

"Defendants") respond to this Set of Requests for Production as provided in Fed. R. Civ. P. 34,

and produce the following documents and things for inspection and copying at the offices of Oliff &

Berridge PLC, 277 South Washington St., Suite 500, Alexandria, Virginia 22314, at such time or

other location as is agreed upon by counsel.

## DEFINITIONS AND INSTRUCTIONS

A.      "Hexagon" means Hexagon Metrology, Inc. (also doing business as Tesa USA,

Brown & Sharpe, Inc., and Sheffield Measurement, Inc.), its predecessors, officers, directors,

employees, agents, corporate parents, related companies, subsidiaries, affiliates and attorneys,

and any other persons acting on behalf of Hexagon.

B.      "Tesa" means Tesa, SA, its predecessors, officers, directors, employees, agents, corporate parents, related companies, subsidiaries, affiliates and attorneys, and any other persons acting on behalf of Tesa.

C.      The term "defendants" refers to Hexagon and Tesa S.A., individually and/or collectively.

D.      The "005 Patent" means United States Patent No. 5,505,005.

E.      The "230 Patent" means United States Patent No. 6,012,230.

F.      "Communication" means the transmittal of information by any means, including electronically, in writing, or orally.

G.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term in Fed. R. Civ. P. 34(a).  In addition, any information contained in any magnetic, optical or other storage media, including computer networks, file servers, computer disks or hard drives, is expressly included within the definition of "document." A draft or non-identical copy is a separate document within the meaning of this term. "Document" means the original document (or a copy thereof if the original is not available), or drafts of any written, printed, typed, recorded or graphic matter of any kind or description, however produced or reproduced, or any copy thereof which differs in any way from the original, including but not limited to notations, underlining or marking, whether or not in the direct possession, custody or control of Hexagon.

H.      "Thing" includes any tangible object.

I.      "Person" or "persons" includes natural persons or individuals, corporations, partnerships, associations and other legal or governmental entities, and all persons acting or purporting to act on their behalf.

2

J.    "Relating to" means referring to, describing, evidencing, constituting, containing, embodying, reflecting, identifying or dealing with.  A communication or document "relating" or "related" to any given subject means any communication or document that constitutes, contains, embodies, reflects, identifies, states, refers to or deals with that subject, including without limitation, documents concerning the preparation of other documents.  "Relating to" shall be broadly construed to mean legally, logically, or factually connected in any way with the subject matter of the request.

K.    In producing documents covered by these requests, Defendants are required to produce any and all documents and things in its actual or constructive possession, custody or control, or in the actual or constructive possession, custody or control of its agents, servants, employees, attorneys, investigators or anyone else acting on its behalf, regardless of the source or authorship of the document.

L.    Plaintiff requests that Hexagon produce the requested documents and things either (a) as they are kept in the usual course of business, *i.e.*, organized and separated in the same manner as they are kept, behind copies of descriptive file folders, drawer labels and/or other identifiers, and/or otherwise identified by custodian or source and subject matter or by (b) specifying for each of the documents and things produced, the production request(s) and subpart(s) thereof to which each document and thing is responsive, as required by Rule 34(b) of the Federal Rules of Civil Procedure.

M.    If Defendants claim any form of privilege or immunity, whether based on a statute or otherwise, as a ground for not producing a requested document or thing, Defendants should, for each such document and thing:

    (a)     identify with specificity the nature of the privilege (including work product) that is being claimed; and

    (b)     provide:

        1.     the type of document or thing,

        2.     the general subject matter of the document or thing,

        3.     the date of the document, and

        4.     such other information as is sufficient to identify the document or thing, including, where appropriate, the author, addressee, custodian, and any other recipient of the document or thing, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

N.     These requests for production of documents and things are continuing in nature. If any document or thing which would be responsive to any of these requests comes to the Defendants' attention after it has produced documents for inspection and copying, Renishaw hereby requests that the Defendants timely produce that document or thing or to timely supplement their response.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

### **REQUEST NO. 1:**

Documents sufficient to explain the design and development of TESASTAR-mp probes and corresponding TESASTAR-pr probe racks, including all documents evidencing, referencing or discussing any modular probe product, patent or publication that was considered as a part of the design and development processes.

**REQUEST NO. 2:**

Documents sufficient to demonstrate the structure and operation of TESASTAR-mp probes and corresponding TESASTAR-pr probe racks.

**REQUEST NO. 3:**

All prior art references considered by defendants to be relevant to the 005 Patent and/or 230 Patent of which defendants are aware.

**REQUEST NO. 4:**

All documents considered by defendants to support or refute any contention of unenforceability of the 005 and/or 230 Patents of which defendants are aware.

**REQUEST NO. 5:**

All documents relating to the structure and operation of Renishaw's TP20 and TP200 modular probes, including any documents evidencing or referencing reverse engineering of the TP20 or TP200 probes, such as drawings, blueprints, manuals, data sheets, computer-aided designs or models, etc.

**REQUEST NO. 6:**

Documents sufficient to show or describe the organization and corporate structure of Hexagon Metrology, Inc. and its relationship (both business and legal) with its parents, subsidiaries, affiliates or related entities, including without limitation, Tesa SA, Tesa USA, Brown & Sharpe, Inc., Sheffield Measurement, Inc., and Hexagon AB.

**REQUEST NO. 7:**

Documents identifying the customers and/or potential customers to whom the TESASTAR-mp and TESASTAR-pr products have been provided, demonstrated, sold, offered

for sale, or discussed for prospective sale, in the United States, as well as the number of units sold, revenue, costs and profits associated with any such sales.

**REQUEST NO. 8:**

Documents identifying machine manufacturers other than Hexagon, including but not limited to Metris and Wenzel, to whom the TESASTAR-mp and TESASTAR-pr products have been provided, demonstrated, sold, offered for sale, or discussed for prospective sale, whether in the United States or abroad, as well as the number of units sold, revenue, costs and profits associated with any such sales.

**REQUEST NO. 9:**

All marketing, sales, financial and/or business plans or forecasts which discuss planned or projected future sales of the TESASTAR-mp and TESASTAR-pr products in the United States and/or to machine manufacturers abroad, including the identities of potential customers, and the anticipated revenue, costs, profits and market share associated with such sales.

**REQUEST NO. 10:**

Documents identifying or describing the market for Renishaw's TP20 and TP200 probes, Renishaw's share of that market, and defendants' plan and/or efforts to increase their share of that market.

**REQUEST NO. 11:**

All sales and marketing materials, including catalogs, brochures, web site materials and specification sheets, that include the TESASTAR-mp and TESASTAR-pr products, and any products with which the TESASTAR-mp and TESASTAR-pr are sold, advertised or offered for sale.

**REQUEST NO. 12:**

Documents, including sales and distribution agreements and price lists, sufficient to demonstrate the business terms by which the TESASTAR-mp and TESASTAR-pr products are sold, distributed or consigned (a) by or to Hexagon Metrology, Inc.'s parents, subsidiaries, affiliates or related entities, including without limitation Tesa SA, Tesa USA, Brown & Sharpe, Inc., Sheffield Measurement, Inc., and Hexagon AB, and (b) by or to any other entities.

**REQUEST NO. 13:**

Documents sufficient to show the sales and distribution network for the TESASTAR-mp and TESASTAR-pr products in the United States.

**REQUEST NO. 14:**

Documents sufficient to identify the first public use, demonstration, sale, and offer for sale of the TESASTAR-mp and TESASTAR-pr products in the United States, including the date of each such event, its location, and any entity or individual who participated.

**REQUEST NO. 15:**

All documents considered by defendants to demonstrate alleged (a) lack of irreparable harm to Renishaw, (b) hardship to defendants, (c) lack of hardship to Renishaw, or (d) harm to public interest, in connection with Renishaw's outstanding motion for preliminary injunction.

**REQUEST NO. 16:**

All documents and things identified, referenced, relied upon, consulted or considered in responding to Plaintiff's First Set of Interrogatories to Defendants.

Dated:    July 3, 2008                    By:    _____
                                                 James A. Oliff
                                                 Edward P. Walker
                                                 John W. O'Meara
                                                 Aaron L Webb
                                                 John A. Radi
                                                 OLIFF & BERRIDGE, PLC
                                                 277 South Washington Street, Suite 500
                                                 P.O. Box 19928
                                                 Alexandria, Virginia 22314
                                                 Telephone:  (703) 836-6400

                                                 Patrick G. Burns, Esquire
                                                 GREER, BURNS & CRAIN, LTD.
                                                 300 South Wacker Drive
                                                 25th Floor
                                                 Chicago, Illinois 60606
                                                 Telephone:  (312) 360-0080
                                                 Facsimile:  (312) 360-9315

                                                 *Attorneys for Plaintiff Renishaw plc*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANTS** was served on the 3rd day of July on the following by e-mail and first class mail:

        Alan L. Barry
        Patricia K. Schmidt
        Jason A. Engel
        BELL, BOYD & LLOYD LLP
        70 W. Madison Street, 3100
        Chicago, IL 60602
        (312) 372-1121
        abarry@bellboyd.com.
        pschmidt@bellboyd.com
        jengel@bellboyd.com

        Attorneys for Defendant Hexagon Metrology, Inc.

By: _____
    John W. O'Meara, Esq.

# EXHIBIT 17

## RESTRICTED DOCUMENT PURSUANT TO LR26.2

# EXHIBIT 18

## RESTRICTED DOCUMENT PURSUANT TO LR26.2

# EXHIBIT 19

## RESTRICTED DOCUMENT PURSUANT TO LR26.2